## BRYAN *vs.* THE UNITED STATES.

1. A surety in the bond of a public officer is entitled to credit for all payments made by his principal during the time he remained in office, and is chargeable only with the moneys received by him during the same time.

2. The naked facts that an officer, having public money in his hands, drew on the Government while he was in office for a further sum to pay certain debts and expenses, which draft was met after he went out of office by a requisition on the Treasury in favor of the payee, and that the officer in the mean time paid the debts and expenses mentioned by him, will not authorize a charge against the surety of the sum drawn for, nor deprive him of his right to a credit for the debts and expenses so paid.

3 In an action against the surety in such a case, it is necessary for the United States to prove that the money was actually paid out of the Treasury and came to the hands of the officer during his term of service, and those facts will not be inferred from the draft, the requisition and the Treasury warrant.

4. A transfer of moneys by the Government to an agent of the officer does not affect the liability of the surety as a transfer to the officer himself.

5. The fidelity or responsibility of the agent through whom the Government sees fit to transfer public money is not within the obligation assumed by the surety.

6. Where the evidence shows a state of facts from which the inference is not deducible that the officer received the money sought to be charged against his surety, it is error to leave the cause to the jury upon the hypothesis that he did receive it.

Writ of error to the Circuit Court of the United States for the District of Columbia.

The United States brought an action of debt in the Circuit Court against Joseph Bryan, one of the sureties in the official bond of Samuel D. King, Surveyor General of California. It appeared that King was commissioned by the President on the 29th of March, 1851, and executed his bond with Bryan and others, as sureties, on the same day. On the 19th of March,

1853, John C. Hays was commissioned as his successor. On the 30th of June, 1853, at San Francisco, Hays gave bond and took the oath. On the 31st of May, 1853, a month before Hays took possession of the office, King wrote to the Commissioner of the Land Office an official letter, in which he admitted that the balance against him on the surveying account, on the 1st of April, was (after deducting what was due him on the salary and contingent account) $13,933 32. But he alleged that payments were made on it to the amount of over $11,000, and that disbursements would be made *during that quarter* requiring more than the amount in his hands. He stated that by the end of the quarter there would be needed on salary account $10,000; on contingent account $6,500; and for other purposes $3,500; in all $20,000. He then added, that "the full amounts as above being needed by the time this reaches your office, and long before a remittance could be received, *I have been compelled to draw upon you at one day's sight for the said sum of* $20,000 *in the form enclosed, which please honor.*" On the same day he wrote again to the Commissioner: "To meet balances due me on settlement of my salary and contingent accounts of the first quarter of 1853, and expenditures under both of those heads, and other expenses *during the present quarter*, I have to request that, one day after sight, a warrant for the sum of $20,000, out of the undermentioned appropriations, may be issued in favor of Charles D. Meigs, cashier of the American Exchange Bank, city of New York, and charged to me as follows, per advice of this date." Then follows a statement showing that the amount referred to is to pay the balance of the first quarter, and to pay expenditures of the second quarter, ending on the 30th of June, 1853.

On the 4th of July, 1853, in accordance with the request contained in these letters, a requisition was made by the Secretary of the Interior upon the Treasury for three warrants on account of Samuel D. King, Surveyor General, for $3,500, $6,500, and $10,000, on which requisition corresponding Treasury warrants and drafts were issued, payable to the cashier of the American Exchange Bank, of New York. The accounting officers of the Treasury charged him with the whole amount of

them.  Between the 31st of May and the 30th of June he disbursed the sum of $11,295, for which he received credit in his accounts.  Allowing him these credits and charging him with the $20,000 for which he drew in favor of Meigs, the balance is against him, as it also is if the credits and the charge be both stricken out.  But allowing the credits without the charge, the balance would be in his favor.  In the Circuit Court the defendant insisted that he was not responsible as surety for the $20,000 paid on the requisition in favor of Meigs, dated the 4th of July, 1853, because that was after his principal in the bond had gone out of office, and that he was entitled to credit for all payments made previous to that time.  For the United States it was claimed that King had raised the money before he went out of office by getting his drafts on the Government cashed, and had applied the money, or part of it, thus raised, to the payment of the debts due by the Government, and it was unjust to the public that his sureties should be permitted to set off his payments out of that money against the balance previously due from him, while they repudiated the charge.  The court instructed the jury as follows:

"If the jury shall find from the evidence that Samuel D. King, as surveyor general of California, prior to the 30th day of June, 1853, paid certain amounts due to himself and other creditors of the Government upon the accounts and salaries, and office rents and contingencies, given in evidence in this cause, out of moneys raised by him upon orders or drafts drawn upon the Government, and by him made known to the Government to have been drawn for the accounts to which the said payments were in fact applied, and that said drafts were paid, and said amounts thereby reimbursed to him by the Government after the 30th day of June, 1853, then it is not competent for the defendant in this action to apply the amounts of those accounts thus by him paid, and extinguished, as a set-off against the amount due by him to the Government upon the survey account prior to the 30th of June, 1853, as given in evidence in this cause."

The defendants took a bill of exceptions.  The verdict was in favor of the United States for $10,531 43, on which the

court gave judgment, and thereupon the defendant below took this writ of error.

*Mr. Bradley* and *Mr. Carlisle*, of Washington city, argued the cause here for the plaintiff in error, and contended that there was no evidence upon which the hypothetical charge of the court below could be sustained. The record will be searched in vain for a single word to justify the declaration that "prior to the 30th of June, 1853, King paid himself and other creditors out of moneys raised by him on orders or drafts drawn upon the Government, and by him made known to the Government to have been drawn, for the accounts to which the said payments were in fact applied." On the contrary, all the evidence repels such a theory.

As sureties can only be held for money lawfully placed in an officer's hands, the time when he received it from the Government, or under its authority, is the period on which the liability of the sureties depends. With the date of drafts and transactions between the officer and his correspondents or bankers the Government has no concern; and as they create no charge upon the Government, and are merely private and unofficial acts, they cannot be employed by the Government to charge the sureties.

From the statement of the account, as exhibited by the Government, it appears that King had public money in his hands to make the disbursements credited in his account. It was his legal duty to apply it to that purpose, and there is no evidence that it was not so applied.

The Treasury transcripts show that the payments credited to King must have been made out of the public money in his hands, and could not have been made out of moneys raised on his draft to Meigs.

*Mr. Bates*, Attorney General, and *Mr. Coffey*, Assistant Attorney General, for the United States.—King owed the Government at the time he drew upon the Treasury, and the Government was in debt to him for his salary, and to other persons on other accounts. With the money he obtained on his

draft while he was still in office he paid those debts. Now his surety claims a credit for the payments made by King between the 31st of May and the 30th of June, and denies the right of the United States to charge him with the very money out of which those payments were made. The defendants in error submit that the payments referred to are in justice and in law applicable, not to the debt which King owed to the Government for moneys previously in his hands, but to the satisfaction of the debt which he incurred by drawing on the Treasury the bill in favor of Meigs, which was afterwards accepted and paid.

The evidence that Meigs cashed the draft, and that King got the money on it and used it, or as much of it as was necessary for the purpose mentioned, is proved by abundant evidence. Certainly it cannot be said that there was not evidence enough to justify the court in submitting it to the jury.

The requisition could not have been drawn in favor of Meigs for any legal or good reason, unless to reimburse him for moneys which before that time he had advanced to King. The letter of King dated the 31st of May, 1853, shows that the money to make the payments which were, in fact, made during the next month could be got only on his draft.

It being unquestionable as matter of fact that King did receive the $20,000 before he retired from office, why are his sureties not as liable for that as for any other moneys received by him from the Government? Can it make any difference that he received the money through a draft from Meigs, and not directly from the Treasury, or that Meigs did not get the money until the 9th of July? To answer this in the affirmative would be to open an easy door to official dishonesty.

The condition of the bond is, that the officer "shall continue truly and faithfully to execute all the duties of the said office according to law." It is broken if he draws for money while he is in office, and receiving it afterwards, refuses to account for it. It has been held that where a collector was chargeable with duty bonds given while he was in office, his sureties and not his successor were entitled to a credit for money paid on them after his term expired. *United States* vs.

*Eckford*, (1 How., 262.) And why? Because the money thus paid was in consequence of the officer's act while he held the office. On the same principle he and his sureties should be liable for money which he receives after he goes out, in consequence of acts done while he was in.

King's sureties had no right to expect that the money would be withheld because he was going out of office; for, *first*, he had already received the money; and, *secondly*, the Government is not bound to endanger the public interests for the protection of a surety. *United States* vs. *Kirkpatrick*, (9 Wh., 735;) *United States* vs. *Van Zandt*, (11 Wh., 184;) *Dox* vs. *P. M. General*, (1 Pet., 323.)

Mr. Justice NELSON. This is a writ of error to the Circuit Court of the United States for the District of Columbia.

The suit was brought by the United States upon the official bond of Samuel D. King, Surveyor General of the public lands of the State of California, against Joseph Bryan, one of his sureties, for moneys received by the principal in the course of the execution of the duties of his office, and which he has not accounted for. The bond was executed on the 29th of March, 1851.

The plaintiff gave in evidence several Treasury transcripts, by which it appeared that, on 30th June, 1853, when King's term of office expired, which was the end of the second quarter of that year, there was a balance due him to an amount exceeding three thousand dollars, although at the end of the first quarter there was a balance against him of some $14,000. But there appeared, also, on the debit side, charged to him, three Treasury warrants, each dated July 9, 1853—one of $10,000, another of $6,500, and the third $3,500, making an aggregate of $20,000, and which sum, if properly chargeable against the sureties, would leave a balance due the plaintiff of $10,531 43. As these warrants bore date on their face, after the expiration of the term of office, which was, on the 30th June, 1853, unexplained, they were of course not so chargeable.

The plaintiff assumed the burden of this explanation, and for that purpose gave in evidence a requisition by King upon

the Commissioner of the Land Office, dated San Francisco, May 30, 1853, giving, in the communication, a general estimate of the sums of money that would be required to meet his disbursements for moneys due in the first quarter of the year 1853, and to become due in the second quarter. These estimates correspond with the sums for which the three Treasury warrants of the 9th July were drawn. A letter also accompanied the estimates and requisition, explaining somewhat at large the grounds of the estimates, and the necessity for the amount required. They were received by the Commissioner in this city on the 25th June following. The requisition of King contained a request that the drafts of the Treasurer for the advance of the moneys called for should be made in favor of Charles D. Meigs, cashier of the American Exchange Bank in the city of New York.

It was in pursuance of this requisition, and letter accompanying the same, that the three Treasury warrants of the 9th July were drawn for the $20,000; and on the 11th of the month the Treasurer drew at sight upon the Assistant Treasurer in the city of New York three bills in favor of Charles D. Meigs, corresponding in amount with the Treasury warrants.

The plaintiff also proved that the Commissioner of the Land Office, on the 30th June, had given notice to Meigs that he had on that day made a requisition in his favor at the request of King for the $20,000. This referred to the requisition of the Commissioner on the Treasury Department for the advance of the money, and in pursuance of which, doubtless, the Treasury warrants and drafts in favor of Meigs, already referred to, were afterwards drawn. It will be observed, that the Treasury warrants were made out nine days, and the drafts drawn in favor of Meigs eleven, after the office of King had expired.

Upon this state of facts, the court below instructed the jury, if they should find from the evidence that King, the Surveyor General, prior to the 30th June, 1853, paid certain amounts due to himself and other creditors of the Government upon the accounts and salaries, office rents and contingencies, given in evidence, out of moneys raised by him upon orders or drafts drawn upon the Government, and by him made known to the

Government to have been drawn for the amounts to which the said payments were in fact applied, and that said drafts were paid and said amounts reimbursed to him by the Government after the 30th June, 1853, then it is not competent for the defendant to apply the amount of those accounts, thus by him paid and extinguished, as a set-off against the amount due by him to the Government upon the survey account prior to June 30, 1853, as given in evidence.

In order to understand these instructions, it is necessary to refer to some facts already stated, namely, that, according to the Treasury transcripts given in evidence by the plaintiff containing a statement of the accounts between King and the Government, debit and credit, down to the 30th June, 1853, when his office ceased, a balance appeared in his favor of some $3,000; but a requisition had been made by him on the 31st May, 1853, during his term of office, on the Commissioner, for the $20,000, and in pursuance of which the three Treasury warrants were made, and drafts drawn in favor of Meigs, of New York, after the office had expired, and that, at the end of the first quarter, the balance was against King.

Now, in view of these facts, the instructions are, if the jury find that King, prior to the 30th June, 1853, (the period when his office expired,) paid the money for which credits were given in the Treasury transcripts, out of money raised by him upon orders of drafts drawn upon the Government, and which were made known by him to the Government to have been so drawn, and that these drafts were paid and the money disbursed by the Government after the 30th of June, 1853—that is, after his office expired—then it was not competent for the defendant, the surety, to apply the moneys thus paid by King as a set-off against his indebtedness to the Government on the survey account prior to the 30th June, 1853, referring, doubtless, to the balance due by him at the end of the first quarter.

In other and shorter words, if King drew on the Government during his term of office, and notified the Government of the fact, and raised money upon these drafts, by which he obtained the credits in the Treasury transcripts, and the Government paid the drafts even after King went out of office, then the

surety could not claim these credits, and would be liable for all moneys in his hands at the expiration of his term not thus applied.

The first observation we have to make upon these instructions is, that they were given to the jury upon a purely hypothetical case, unsupported by any evidence to which it could be applied.

There is no evidence in the case to show out of what particular moneys King paid the expenses of his office during the period referred to, and obtained the credits, or that he raised any money for this purpose by means of drafts on the Government, or that the Government paid any drafts drawn by him before or after the expiration of his term of office. The only evidence relating to this subject is the requisition of King upon the Commissioner of the Land Office, already referred to, dated the 31st May, 1853, and received the 25th June by the Commissioner, five days before his office expired, and the Treasury warrants of the 9th July, and drafts in favor of Meigs of the 11th for the $20,000. These furnish all the evidence of any drafts upon, or disbursements by, the Government in the case.

The next observation we have to make is, that there is no evidence in the case that the Government has advanced any portion of the $20,000 to King, either during his term of office or since. It is true, the Treasury warrants were made out and charged to him, and drafts drawn in favor of Meigs by the Treasurer upon the Assistant Treasurer in the city of New York for this amount on the 9th and 11th of July, 1853. But there is no evidence that these drafts ever came to the hands of Meigs, or that the Assistant Treasurer was ever called on to pay, or ever paid them. For aught that appears, the money may still be in the Treasury. These are facts which, if material to charge the surety, should have been proved, and not left to presumption or conjecture; and even if we were to presume all this, and believe, without proof, that the Government transmitted the drafts to Meigs, and that he received the moneys from the Assistant Treasurer, there is no evidence that the money came to the hands of King. We are not prepared to

admit that the trans.er of moneys by the Government to the agent of the officer is ·equivalent to a transfer to the officer himself, so far as the liability of the surety is concerned. The fidelity or responsibility of the agent through whom the Government may see fit to thus transfer the public money, is not within the obligation assumed by the surety in the official bond. He is responsible only for all moneys which came into the hands of the officer while in office, and which he subsequently fails to account for and pay over. 12 Wh., 505.

The questions, therefore, put to the jury as to drafts drawn by King upon the Government, and of moneys having been raised upon them during his term of office, out of which he had obtained the credits given in the Treasury transcripts, and of the subsequent payment of the drafts by the Government, were entirely hypothetical, unsupported by the evidence in the case, and, of course, whichever way found, laid no foundation for the inference stated in the instructions, that the surety could not claim these credits, and would be liable for all moneys in the hands of the officer at the expiration of his office not thus applied.

As the case has been very imperfectly tried, and must be sent down for another trial, we shall make no observations concerning it in anticipation of the facts that may be proved on the part of the Government, except to say, that in order to charge the surety for the default of the officer, it must appear from the evidence that the public moneys in question came into his hands, either in point of fact or in judgment of law, previous to the time when the term of office expired.

*Judgment reversed, venire de novo.*