## MILTENBERGER v. COOKE.

1. When a collector of internal revenue in a rural district of Mississippi—where, owing to the lawless condition in which the rebellion, then but recently suppressed, had left the region, it was not safe to have gold and silver in one's house—in violation of the provisions of the Independent Treasury Act, but with an apparently good motive—openly and without indirection, and because he thought it more safe thus to act than to take gold and silver—took in payment of taxes on cotton, accepted drafts drawn by the shippers of it on consignees of it in New Orleans (which was the place of deposit for taxes collected in Mississippi), afterwards (the drafts not being paid, and he having in his accounts with the government charged himself and been charged by it with the tax as if paid in gold and silver), sued the acceptors, the fact that in taking the drafts instead of gold and silver, he had acted in violation of the statutes of the United States, does not so taint his act with illegality as that he cannot recover on them; the government not having repudiated his act nor called on the shipper to pay, but on the contrary, leaving the account of the collector open to see if he could not himself get the amount from the acceptor of the drafts.

2. As between the parties the collector's charging himself with the tax and reporting it to the government as paid, would be payment by the collector of the tax.

3. Where a party authorized another to draw different drafts on him upon different consignments to be made, and this other made different consignments and drew different drafts, the party authorizing the drafts accepts them in advance, and should set aside and hold enough money from the proceeds of the consignments to pay them, come in for payment when they may. If after such promise to accept, drafts are drawn through a term beginning in October of one year and running into February of another (the drawee as the drafts are drawn being advised of the fact that the drafts have been drawn), it is no excuse when the drafts do come in, as, *ex. gr.*, in the middle of April of the second year, for the drawee to say that from their not being presented in due course, he supposed that the drawer had taken them up, and that on this assumption he had closed accounts with him and paid over to him the balance found. He is bound to pay the drafts.

ERROR to the Supreme Court of Louisiana; the case being thus:

An act of August 6th, 1846,* commonly known as the "Independent Treasury Act," thus enacts:

"SECTION 18. All duties, taxes, . . . debts, and sums of money

---

* 9 Stat. at Large, 59.

accruing or becoming due to the United States, . . . shall be paid in gold or silver coin *only*, or in treasury notes.

"SECTION 19. Any receiving . . . officer or agent, who shall neglect, evade or violate the provisions . . . of the last preceding section of this act, shall by the Secretary of the Treasury be immediately reported to the President of the United States with the facts of such neglect, evasion, or violation, and also to Congress."

Other sections of the act most carefully provide that no officers with whom money is deposited shall in any manner alter the condition of this money. They are not to use it, lend it, exchange it, deposit it with other persons or depositories except those described in the act. The sixteenth section of the act provides for exact entries of every official transaction of receipt, payment, or transfer, and provides that all irregular or unclean dealing with this public money shall be deemed a felony.

An act of July 13th, 1866,* after enacting that subsequently to the 1st of August following " there shall be paid . . . a tax of three cents per pound on cotton," proceeds:

"And said tax shall be paid to the collector of internal revenue within and for the collection district in which said cotton shall have been produced, and before the same shall have been removed therefrom. And every collector to whom any tax upon cotton shall be paid shall mark the bales . . . upon which the tax shall have been paid in such manner as may clearly indicate the payment thereof, and shall give to the owner or other person having charge of such cotton a permit for the removal of the same, stating therein the amount and payment of the tax, the time and place of payment, and the weight and marks upon the bales . . . so that the same may be fully identified."

These statutes being in force, Cooke, resident at Hazlehurst, Mississippi, some one hundred and fifty miles north of New Orleans, and collector of internal revenue for the district of Mississippi, in September, 1866—at which date, the rebellion having been suppressed only within about eighteen months, and the whole rural districts of Mississippi being

* 14 Stat. at Large, 98.

still more or less in a disorganized and lawless condition, it was not desirable for either collectors in them or their deputies to have on hand large sums of money,—gave public notice in newspapers that the owners or holders of cotton in Mississippi might bring it to the usual shipping-places, adding that as the amount received for taxes on all this cotton would have to be deposited in New Orleans [which was the place of deposit for the Mississippi District], it would suit him and might afford facilities to shippers if he received the amount by draft of the shipper on the consignees in New Orleans, and that he would receive such drafts if the consignees would recognize them so as to make the amount available to him, the collector, at his place of deposit, New Orleans.

Thereupon, Caruthers & Co., residents at Osyka, in the interior of the State, and about half-way between Hazlehurst and New Orleans, having certain cotton which they wished to ship to Miltenberger & Co., their correspondents at New Orleans, wrote to these last:

"October 24th, 1866.

"Please to inform us whether it would suit you if we were to give a draft on you for the internal revenue tax; the collector here preferring the same to money."

To this Miltenberger & Co., in two days after, replied:

"October 26th, 1866.

"We have no objection to your drafting to us in payment of the internal revenue tax on cotton shipped to us. Your drafts for same will, therefore, be duly honored."

Hereupon Caruthers & Co., shipping cotton to Miltenberger & Co., at different times, did at or about these same times, draw on them to the order of Cooke, the deputy, some eight or ten drafts, most of them at sight, others at short date, for the taxes chargeable on it. These drafts were given to the deputy collector,—he having seen the letter of Miltenberger & Co., promising to accept, &c.,—the bales were marked in the way that the above-quoted statute of 1866 required when the tax was paid, and a permit was given for

the removal of the cotton to New Orleans. The collector charged himself with the tax as paid; reported it to the government as paid to him; and was charged with it by the government accordingly. His commissions were 5 per cent. on all amounts paid over. Caruthers & Co. shipped the cotton to Miltenberger & Co. at the city named, and advised them, as they drew the different drafts, of the fact that they had done so. All the drafts drawn were indorsed by the deputy collector, to whom they were given, to Cooke, the principal collector, and two of them went in at once and were paid; but either from the deputy's not sending them to his principal as he got them, or from the principal's not sending them on in regular course to New Orleans for collection, or from some other cause, six of them—drawn between October, 1866, and February, 1867—did not go in for payment till April of the latter year. Miltenberger & Co. then refused to pay, alleging that they now had no cotton belonging to Caruthers & Co., that the non-presentment of the drafts, in due course, had led them to suppose that Caruthers & Co. had themselves in some way taken them up, and that the account of the house had been settled upon that assumption.

Hereupon Cooke sued Miltenberger & Co. to recover on the drafts, and upon what was alleged to be an acceptance of them made in the letter of the said Miltenberger & Co., of October 26th, 1866.

Miltenberger & Co. set up as defence the matters already indicated, and more particularly:

That the laws of the United States did not authorize or permit the collectors of revenue to take or accept drafts for the payment of taxes, or any other thing, except the lawful money of the United States; but, on the contrary, particularly and explicitly prohibited the mode of collection set forth and described in the petition of the plaintiff, and that what had been done was a violation of the acts of Congress in this behalf.

The court below gave judgment for the plaintiff, and the defendants took this writ of error.

It was testified to by Cooke himself, on the trial of the case below, that while the Treasury Department had not "sanctioned" what he had done, it authorized him "to avail himself of exchange;" that he had collected, through drafts by shippers of cotton, on its consignees, nearly all the revenue of his district, $500,000 or more; that in the then condition of Mississippi he deemed it safer so to collect it than to collect it in any other way; and that the Treasury Department had left his account open to see whether he could get this money.

*Messrs. J. A. and D. G. Campbell, for the plaintiff in error:*

A collector of taxes charged with the duty of receiving gold or silver or treasury notes, or notes of the National banks, for the taxes imposed upon cotton, and upon the receipt of the amount, to enter the fact upon his books; stamp it upon the bales of cotton; declare it as a fact in the permit for the removal of the cotton from the district; and faithfully report it to the government,—*neglects, evades,* and *violates* his duty when he takes a draft on a commission merchant at a distance, upon a promise contained in a letter to a taxpayer, for the amount of the tax, and treats that draft as lawful money, and allows the removal of the cotton and facilitates its removal and sale by false stamps and false statements in his permits, and does not pay the taxes to the United States.

And the question is, whether a collector of the United States who neglects, evades, and violates his duty, can through the courts of the United States get the benefit of his neglect, evasion, and violation of duty, when he finds that they have failed to secure to him the benefits of compliance with, conformity to, and performance of duty?

The interest of the United States as declared in the acts of Congress is that the collecting, receiving, and disbursing officers of the United States shall know, that all the money which shall pass through their hands as public officers, belongs to the United States, and under no conditions or circumstances shall they presume to deal with it as if they had

any sort of ownership, estate, or authority to make any other disposition of it than the law prescribes. The danger from persons in fiscal offices is their forgetfulness of this essential knowledge. The statutes permit no use of the government money, nor exertion of the powers for its collection, receipt or disbursement for any private object. A slight deviation from the austere and self-denying habit prescribed in the rule of the treasury is treated as an infamous offence, a felony. By the light of these statutes it is apparent that this collector's acts are reprobated acts. He has assumed to dispense with the fundamental principle of the acts of Congress relative to the currency in advance. He establishes commercial relations with mercantile partnerships, and the factors of country dealers, on behalf of the treasury of the United States. If he had farmed the revenues in his district from the government by contract, his control over the tax collections could not have been more decidedly that of an owner.

If Cooke had acted with motives the best, the most completely above suspicion, all these observations would apply. But it is not difficult to assign a motive for what was his confessedly irregular and illegal conduct. In the first place his commissions depended upon the amount of his collections and was not limited by a maximum; then there were incidental advantages, supposed to arise from a dispensation on his part, of the laws and the treasury regulations. We find that these drafts were not presented regularly or promptly.

*Mr. O. D. Barret, contra*

Mr. Justice SWAYNE delivered the opinion of the court.

The question presented for our determination is whether the securities upon which the judgment was recovered, are fatally tainted with illegality.

Cooke was the collector of internal revenue for one of the collection districts of Mississippi. Curtis was his deputy. New Orleans was the designated place of deposit for the

revenue collected. In the state of things then existing in Mississippi, it was dangerous for the collector to have money about him. He, therefore, advertised that he would receive payment of the tax upon cotton by drafts upon New Orleans. He took such drafts instead of money as a matter of safety. Nearly all the revenue paid was thus collected. He received a half million of dollars or more in this way. All the drafts taken were paid, except those in question in this case and one or two others. None were received but such as were considered good. The collector was authorized to transmit to New Orleans the moneys collected by buying exchange. When the drafts were given the bales were marked as if the tax had been paid, and the requisite permit for their removal was delivered. The drafts in question were taken by Curtis, by the authority of Cooke, and indorsed by the former to the latter. They were all received for the tax not otherwise paid, upon cotton shipped to Miltenberger & Co. by Caruthers & Co., the drawers of the drafts. Caruthers & Co. drew them pursuant to a letter from the plaintiffs in error, which, under such circumstances, authorized them to be drawn, and promised to accept and pay them. Curtis took the drafts upon the faith of this letter. Miltenberger & Co. were advised at the time of the drawing of each draft and of the shipment of the cotton, upon which it was founded. Cooke, in these as in all other instances of the kind, reported the tax to the government as paid, and charged himself accordingly, and was so charged upon the books of the Treasury Department. He considered the tax paid by such transactions, and the drafts wholly at his risk. The proper officers of the revenue bureau, with knowledge of the facts, have left his account open as to the amount of these drafts, and given him time to collect them.

Such is the case upon the facts as presented in the record.

The act of August 6th, 1846,* requires all taxes and duties accruing to the government to be paid in gold and silver, or treasury notes. The act of July 13th, 1866,† imposed a tax

---

* Brightly's Digest, 888.          † 14 Stat. at Large, 98.

of three cents per pound upon all cotton raised in the United States, and required the tax to be paid in the district where it was produced before its removal, with an exception which does not affect this case. The collector, upon receiving payment, was required to mark the bales and packages accordingly, and to give the owner or person in charge of the cotton a permit for its removal, stating the amount and payment of the tax, the time and place of payment, and the marks upon the bales and packages, so that they could be identified; and it was made his duty to keep an account of all cotton inspected and of the marks and identifications, and of all permits for removal issued, and of all his transactions in relation thereto, and to make full returns monthly to the Commissioner of Internal Revenue.

The judgment of the court below must be sustained upon several grounds:

As between the parties, the tax was paid by Cooke for Caruthers & Co. His marking the bales, giving the permit, charging himself with the amount, and reporting it to the government as paid, had that effect. The result was the same to Caruthers & Co. as if so much money had been advanced at their request, and so applied for their benefit. They were permitted to ship the cotton to the plaintiffs in error, in all respects as if the money had been actually paid and the requisite vouchers had been given upon the basis of such payment. The assumpsit of the collector supplied the place of the money. No demand has been made by the government against Caruthers & Co. They have had the full benefit of the arrangement. As between them and Cooke, the transaction is as if Cooke had lent Caruthers & Co. the amount in gold or silver, or treasury notes, with one hand, and received it back with the other. It has been held that promissory notes given under such circumstances can be enforced by the payee.*

---

* St. Alban's Bank *v.* Dillon & McGowan, 30 Vermont, 122; Kelley *v.* Noyes, 43 New Hampshire, 211; see also Smith *v.* Mawhood, 14 Meeson & Welsby, 463.

Conceding that the transaction was illegal, the statutory provisions relied upon by the plaintiffs in error are for the protection and benefit of the United States, and it was for the latter to object or not as they deemed proper. In this view of the case, they could have repudiated the transaction and called upon Caruthers & Co. for payment. With full knowledge of the facts they chose not to do so. The matter was one between them and their agent. The option to object belonged to the government and cannot be exercised by those who have not and could not have been injured.

The written promise of the plaintiffs in error to accept these drafts was equivalent to acceptance. No question is raised upon that subject by their counsel. After notice of the drawing of the drafts, and the sale of the cotton, they had so much money in their hands to be applied according to their engagement. There was no stipulation between them and Cooke. Their contract was with Caruthers & Co. When the money was received for the cotton they held it in trust for Cooke, and their sole duty and business in relation to it was to pay it over upon the drafts when called for, according to their agreement. If they paid it to Caruthers & Co. they did so in their own wrong. The fact in no wise affected their liability to Cooke and is not an element in the case to be considered. In no view can they be permitted to keep the money for their own use, or avail themselves of a payment made in violation of Cooke's rights and their duty. They can no more object to the consideration of the drafts than if the money were still in their hands. For the purposes of this case, it must be regarded as there when payment of the drafts was demanded.

It is a consideration of weight, though not controlling, that there is nothing disclosed which looks like fraud on the part of the defendant in error. There was neither concealment, indirection, nor oppression. Nothing beyond the tax was demanded or stipulated to be paid. Caruthers & Co. received in full the consideration upon which the drafts were drawn, and the defendants in full the consideration upon which they agreed to accept and pay them. It would

be contrary to equity and good conscience, as well as the law, to permit the plaintiffs in error to cast upon the defendant in error the burden of the loss to which they have endeavored to subject him.

JUDGMENT AFFIRMED.