## STATE OF ARKANSAS VS. NEWTON ET AL.

1. *Agency.*
   The State Treasurer and his bondsmen are liable for the official conduct of his deputy.

2. STATE TREASURER; *Duty and Liability as to funds of the State.*
   It is the duty of the State Treasurer to receive from his predecessor in office the moneys and securities of the State in his hands; and to receive from the Collectors of revenue the balances certified by the Auditor to be due from them, and if he accepts in lieu thereof the receipt or check of a depository, with whom the same was left by the officer, he becomes liable therefor on official bond.

3. EVIDENCE. *Balances.*
   In an action on the official bond of the State Treasurer, a copy of his accounts from the Auditor's books, properly certified, is *prima facie* evidence of the state of his accounts; and the jury should be instructed not to go into the accounts, but to take the balance certified by the Auditor, unless the accuracy of the items are impeached.

4. ———— :   *As affecting sureties.*

A copy of accounts rendered by the State Treasurer, being statements made by him to the State in the performance of his official duties, is *prima facie* evidence against him and his sureties, in an action on his official bond; the surety is bound by the acts and declarations of the principal, when they are within the scope of the business, and a part of the *res gestae.*

APPEAL from *Pulaski* Circuit Court.

Hon. J. W. MARTIN, Circuit Judge.

*Henderson, Attorney General,* for the State.

———— *Contra.*

SMITH, SP. J. :

This was an action against Robert C. Newton and the sureties on his official bond as Treasurer of the State, in which the defendants had the verdict.   The breaches assigned are :

*First*—That during his term Newton had received $14,557.86 in United States currency, and $32,525.73 in Arkansas treasury certificates, the property of the State, which he had suffered to be kept in the bank of Stoddard Brothers & Co., who, afterwards, and before the funds were drawn out, suspended payment and became bankrupts, and so the said funds were never paid out and disbursed by him, nor delivered to his successor, nor otherwise accounted for, but on the contrary became lost to plaintiff.

*Second*—That knowing said funds to be in the hands of said bankers, he had neglected to demand and receive the same of them.

The answer denied the receipt of the funds and the acts of negligence complained of, and averred performance of the condition of the bond.

Newton was Treasurer from May 23d, 1874, to November 12th, 1874.   Before entering upon his office, the defendants executed this bond, the condition of which is, that Newton shall faithfully perform the duties of his office.   He gave no personal attention to his office, but entrusted the management

of it to a deputy, one James A. Martin. In the time of his predecessor, Henry Page, many of the County Collectors had fallen into the habit of paying the revenue through Stoddard Brothers & Co, The course of business seems to have been thus: The Collectors deposited in the bank the State taxes collected by them. By settlement with the Auditor, they ascertained the exact balance against them. Stoddard Bros. & Co. then procured from the Treasurer acquittances for the balance by giving him checks upon themselves. These instruments were nothing more than memorandum checks, although it does not appear that the word "memorandum" was written across the face of them. They were in the ordinary form of bank checks, not intended, however, for immediate presentation, but simply as evidences of indebted- by the drawer to the holder.

As a consequence of this pernicious practice, when Page retired from office, there were $18,000 belonging to the general revenue funds which should have been in the treasury, but. for which checks drawn by Stoddard Brothers & Co. on them- selves, had been substituted. Newton's deputy took these checks and receipted to Page for the whole revenue fund. About $7000 were afterwards paid on account of these checks. Of the residue, payment seems never to have been demanded, although the bank continued to be a going concern, and apparently solvent until after Newton's term had expired.

Martin kept up the evil system which he found established in the office. In this way $600,000 or $700,000 of the State's. revenue were allowed to pass through this devious channel. Stoddard deposes that he settled for nine-tenths of the revenue —perhaps for nineteen-twentieths of it. Martin says that he saw not one of these Collectors, nor any representative of them, except Stoddard. He gave receipts to Stoddard to be delivered to the several Collectors, and accepted checks in pay-

ment of their dues. Upon the checks so taken there was a further loss of $36,083.59.

We think it would be a reproach to the administration of justice if, upon this state of facts, the plaintiff could not recover.

We shall speak of Martin's acts as the acts of his principal, for, in contemplation of law, they are his acts. Martin was the servant of Newton, and not the agent of the State; Newton selected him and put him in his place. The State did not even pay Martin's salary. Gantt's Dig., secs. 2798, 2799. The above cited statute expressly makes the Treasurer responsible on his official bond for the conduct of his deputy. The deputy is the mere shadow of the officer. The moral responsibility for this defalcation doubtless rests upon Martin and not upon Newton; but as regards civil liability, their acts cannot be discriminated. It is proper to remark, however, that the evidence shows that Newton was not aware of what was going forward in his office.

The substantial ground upon which a recovery was resisted is, that the funds for which the Treasurer receipted, never actually came to his hands. If this was not a good defense, or if it was one which the defendant could not interpose, then it must be conceded that the verdict and judgment below were wrong.

This precise question came before the Supreme Court of the United States in Girault's case, 11 Howard, 22. Girault was a Receiver of public moneys. An action was brought on his official bond against him and his sureties. The condition of that bond was the same as the one before us. The breach assigned was the receipt and non-payment of public moneys. The second plea alleged that after the making of the bond, Girault, as Receiver, gave receipts for moneys paid on the entry of certain lands therein specified, and returned the same to the

Treasury Department, and that no part of said moneys was paid to or received by Girault. The third plea was the same, except it alleged the receipts to have been given for lands entered by Girault for his own use. The District Court adjudged these pleas to be sufficient on demurrer; but the Supreme Court say that they are bad and that the principle on which they are founded is indefensible. We quote their language, " The condition of the bond is that Girault shall faithfully execute and discharge the duties of his office as Receiver of Public Moneys. The defendants have bound themselves for the fulfillment of these duties, and are of course responsible for the very fraud committed upon the government by that officer, which is sought to be set up here in bar of the action on the bond. As Girault would not be allowed to set up his own fraud for the purpose of disproving the evidence of his indebtedness, we do not see but that upon the same principle they (the sureties) should be estopped from setting it up as committed by one for whose fidelity they have become responsible."

This case is distinguishable from *United States* v. *Boyd*, 3 Howard, 29. There a Receiver had entered government lands in his own name, and in the name of others for his benefit, without paying for them, except by charging himself in his account with so much money received, and had permitted another party to make entries, taking, instead of money, checks on a bank which proved to be worthless.

The court say that these acts made Boyd a defaulter to the Government, and would have subjected his sureties to liability, if there had been an official bond covering the period when the acts were done. But by some oversight the Receiver had been permitted to enter upon the duties of his office without a bond; the acts, out of which the defalcation arose, had been committed before the bond was executed, and the lan-

guage of the bond not being retrospective, the sureties could not be held for past misconduct.

The same principle, that sureties are not responsible for the previous delinquences of their principal, unless they expressly so stipulate, runs through the cases of *United States* v. *Giles*, 9 Cranch., 212 ; *Farrar* v. *United States*, 5 Peters, 373 ; and *United States* v. *Eckford's Executors*, 1 Howard, 250. So in *Bryan* v. *United States*, 1 Black, 140, it was ruled that the surety was not liable for money received by his principal after the expiration of his term of office. But it is plain that the acts here complained of occurred while Newton was in office, and after the making of the bond. And that bond is broad enough to cover the faithful performance of all his official duties. The condition of it might be broken by acts of omission or commission, by a failure to do what a reasonable and prudent person would ordinarily have done under the circumstances, as well as by doing what such a person would not have done. Wharton on Negligence, sec. 1 ; *Railroad Company* v. *Jones*, 5 Otto, 439.

The paying over of the moneys that come into the Treasury is only a part of the Treasurer's duty. It was Newton's duty, upon his accession to office, to receive the public moneys, evidences of debt due the State, and other securities and papers of value that were in the hands of his predecessor. It is provided by the law that he shall receive and keep all moneys of the State not expressly required to be kept by some other person. Gantt's Digest, sec. 2803. It was also his duty to receive from the County Collectors the State's revenue shown to be in their hands by their settlements with the Auditor. These amounts he was required to receive in certain specified funds. It was his further duty to keep these funds after they were received, in the vault for that purpose provided by the State, and he was expressly prohibited from depositing any

portion of them in any bank or banking-house, or with any firm or corporation.   Gantt's Digest, sec. 2814.

How have these duties been performed?   Instead of de-manding and exacting the funds prescribed by law, the Treas-urer has taken the obligations of individuals.   These are at his own risk.   *Board of Justice* v. *Fennimore*, 1 Coxe (N. J.) 190 and 242.   He is certainly in no better position than if he had taken counterfeit money.   In that case it could not be said that he had received the money, or that there had been any valid payment by Page or by the collectors.   Yet his liability on his official bond would be unquestionable.   *United States* v. *Morgan*, 11 Howard, 154 and cases there cited.

This case cannot be distinguished in principle from the com-mon case of a Sheriff who receives in satisfaction of an execution something else than money.   In so doing he exceeds his authority, and it is no payment unless the plaintiff chooses to consider it so.   The judgment creditor still has his remedy against his debtor, and may proceed against him, disregarding the attempted payment.   But it has never been doubted, so far as we are aware, that the Sheriff is liable for a breach of official duty.   *Randolph* v. *Ringgold*, 10 Ark., 279.

The reception of these checks were an accommodation to Page and the collectors.   It was the same in effect as if New-ton had advanced so much money for them at their request, and had applied it for their benefit.   Conceding the illegality of the transaction, it was for the State to object.   *Miltonber-ger* v. *Cooke*, 18 Wall., 421.   The State had her election to treat these checks as so much money received by Newton.   He so treated them himself, as is manifested by his retention of them during his whole term of office, and by his charging him-self with the amount of them in his quarterly statements to the Auditor.   The State was ignorant of the true situation of affairs, and had not the same means of knowledge that Newton

possessed.  By his conduct she was deceived and misled to her injury.  If the State had known that Page was a defaulter, she would have pursued him upon his bond.  But his sureties may now be dead, may have left the State or may have become insolvent.  Against these collectors the State had a summary remedy in case they failed to pay their balances into the Treasury within fifteen days after settlement with the Auditor.  In this event the delinquent collector forfeited his commission and incurred a penalty of 25 per cent. on the amount so wrongfully withheld, besides interest on the same at the rate of 5 per cent. a month until payment was made ; and to enforce collection of the debt and of these enormous penalties, the State could, without submitting her claim to any judicial tribunal, have her distress warrant and levy upon and sell the goods and chattels, lands and tenements of such delinquent and his sureties.  Gantt's Dig. secs. 5247, 5248.  Furthermore the non-payment by a collector of the amount found due from him upon settlement is by statute made embezzlement and a felony.  Gantt's Dig. sec. 1371..

But according to the system pursued by Newton, it did not appear that there was any default.  Page had his receipt ; the collectors their quietus ; and the books showed that the whole revenue had been paid in.  Thus the State, influenced by the acts and declarations of Newton, has altered her position with regard to these debtors.  It would operate as a fraud upon her for Newton to be now permitted to deny what he has heretofore affirmed.  He cannot relieve himself from liability by showing that his deputy violated the law.  This would be to take advantage of his own wrong.  Nor are his sureties in any better attitude ; for they have undertaken for the fidelity, not only of Newton, but of his subordinates.

To reach this conclusion, we are not constrained to hold to the doctrine of *Baker* v. *Preston*, 1 Gilmer (Va.) R. 235 and

*State* v. *Grammar*, 29 Ind., 530, that the entries made by an officer in his books are conclusive evidence of the state of his accounts. It is well settled that they are open to explanation and consideration. *United States* v. *Boyd*, 5 Howard, 29; *Hatch* v. *Attleborough*, 97 Mass., 537.

Receipts likewise are generally examinable, especially when they have not been acted upon by third persons. Cases of duress, fraud, mistake, accident or surprise may be readily imagined when it would work the grossest injustice to hold otherwise. Nor is there anything conclusive in the certified transcript from the Auditor's office. The statute provides that "when a debt due to the State appears upon the books of the Auditor, or any other public officer, whose duty it shall be to audit and keep an accurate account of such debt, a copy of the balance due upon the books of such Auditor or other officer, certified by him to be a correct and true balance, shall be sufficient evidence of such indebtedness." Gantt's Dig. sec. 2452. The word "sufficient" must be interpreted *"prima facie."* *C. & F. R. R. Co.* v. *Parks*, 32 Ark., 131. The production of a copy of the account from the Auditor's books, properly certified, made a *prima facie* case for the plaintiff, and dispensed with other proof of the same facts and results. The Auditor makes up the Treasurer's account, adjusts the same on his books, and the account thus stated stands as and for the sum for which the Treasurer is liable. The defendants might then show any errors, mistakes or omissions of credit in making up the account which prejudiced them, subject to the restriction contained in sec. 5687, Gantt's Dig. which prohibits the allowance of any set off, except such as has been exhibited to and allowed by the Auditor, unless upon proof that the defendant is now in posession of vouchers which could not be produced to the Auditor when the account was made up.

There is no occasion to decide, and we do not decide, that Page and the Collectors are released. There is both reason and authority for saying, that a public debtor is never discharged until the money which he owes gets into the hands of an officer entitled to receive it. *Taylor* v. *Auditor,* 2 Ark., 174; *United States* v. *Patterson,* 7 Cranch., 575. It may be that the State can resort to the bonds of each and every one of these officers for injuries, to which their own official wrong and negligence have in any degree contributed, though evidently she can have but one satisfaction.

Nor is it for us to determine whether or not Newton may have his action against the former Treasurer and the several collectors; although it is probable that the maxim *"in pari delicto,"* etc., would not bar a recovery against them. In *Miltinberger* v. *Cooke, supra,* an Internal Revenue Collector for a district in Mississippi, whose duty it was to collect the cotton tax, received, instead of currency, drafts on a commission merchant in New Orleans, who had previously promised to accept. And notwithstanding the unlawfulness of the arrangement was urged upon the court, it was held the Collector might recover of the drawer.

All that we decide is, that it is futile for these defendants to say that Newton or his deputy falsely pretended to have received money, gave his receipts therefor, and charged himself therewith, when in fact he had not received it. Such acts themselves constitute a malfeasance in office for which the defendants are liable.

The case of *Edwards* v. *Taylor,* 4 Bibb., 353, cited as in point for appellee, has to our minds no just analogy. There the deputy of an incoming Sheriff receipted to the retiring Sheriff for the amount of the fee bills, delinquent taxes and uncollected fines, remaining in the office when the new officer took possession. And it was held that the principal and his

securities were not bound by this act of the deputy. But upon what grounds? Because, by the law of Kentucky, the new Sheriff was under no obligation to receive from his predecessor such fee bills, taxes and fines, for collection. We have already shown that by the laws of this State, it is the Treasurer's duty to receive from his predecessor the moneys and securities of the State in his hands, and to receive from the Collectors the balances certified by the Auditor to be due from them.

The argument, that the officer and his sureties are not responsible for the illegal and unauthorized acts of the deputy, prove too much. We believe it to be one of the considerations which induced the policy of requiring bonds of the officers to protect the public against such acts. And as a matter of abstract justice, it is more in consonance with reason and right that the defendants should suffer for the neglect and unfaithfulness of Martin than the State, who was not responsible for his appointment, and had no means of controlling his actions, because this was directly within the condition of their bond.

And the argument that the defendants should not be held for this miscarriage, because the funds never actually came into the Treasury, would release Page as well as Newton, and show that no one was really liable, for there is no doubt that the $18,000 deficit was incurred by the same method of settling the revenue through Stoddard Brothers & Co., that was pursued during Newton's term. Such a result would be no objection, if it was the law, but we have taken a different view.

Counsel for the appellees have discussed elaborately the doctrine of the appropriation of payments in this class of cases. We are not sure that we correctly apprehend the drift of their argument on this subject. It appears from a somewhat confused record, in which the statements of the witnesses are

State of Arkansas vs. Newton, et al.

sometimes contradictory and sometimes unintelligible, that at the time Newton took office, there were in Stoddard's Bank about $88,000, of which $70,000 belonged to the Industrial University, and the remainder to the State.    Of this University fund a portion was afterwards collected, say $34,000. Add this last amount to  the $7000 collected on account of Stoddard's checks given to Page and transferred to Newton, and it reduces Stoddard's indebtedness to the extent of $41,000, which is more than the $36,083.59 afterwards lost by Martin in settling with the Collectors.   Now assuredly the collections on account of the University fund ought not to be credited upon the amount due to the State.   This fund is raised by the sale of the lands, or of agricultural scrip, donated by the Act of Congress, approved July 2, 1862.   The State has no beneficial interest in  this fund, but holds it  as the trustee of an express trust, and under a guaranty that  it shall never be lost or diminished.   The Treasurer is her financial agent to receive this fund and to disburse the annual interest thereof, under the direction of a Board of Trustees for said University.

Nor was any injustice done the defendants by the application of the $7000 collected by Newton on the checks received by him of his predecessor.   According to the view we have taken it makes  no practical difference to the defendants  in what manner this payment is applied.   If applied to the reduction of Newton's indebtedness arising out of his deputy's dealings with the Collectors, his indebtedness on account of his transactions with Page will be increased to a corresponding amount, and vice versa.   In point of fact the credit seems to have been applied according to the wishes, or at least with the acquiescence of all parties who had any interest in the matter, and it is now too late to disturb it.

It would  serve no useful purpose to  examine in detail the various grounds of the motion for a new trial, or to criticise

the numerous prayers for instructions granted and refused in the trial court.    Suffice it to say, that the Judge at Circuit tried this case  upon a wrong theory, to-wit: That defendants were liable only for such sums as actually came into the State Treasury.    Hence he erred in the admission and rejection of testimony, and in his directions to the jury; and especially erred in not granting the plaintiff a new trial.    If the jury had found a special verdict embodying the facts proven by the witnesses for the defendants, and upon which they relied for their discharge, it would have been the duty of the court to enter judgment for the plaintiff, for, conceding all that the evidence for defendants tends to prove, it fails to show any thing that will excuse them.    There is no substantial controversy about the principal facts in the case.

We shall  only  discuss  such  of  the  matters raised by the record as we think will be of assistance to the court and counsel upon a second trial.

And first with regard to the pleadings ; it has been a matter of doubt whether the pleader, by his original complaint, intended to assign one or two breaches.  It avers the receipt and non-payment of certain funds and deposit of the funds in a place forbidden by law, whereby they were lost.   The complaint was not divided into paragraphs.   It may be advisable to amend the pleadings by stating the facts as they really occurred.

The amended complaint is seriously defective in that it does not show how the funds came into the hands of Stoddard Brothers & Co., or that Newton had any control over them. We cannot say that it is the business of the Treasurer to hunt up the property of the State that may be lying around loose.

All the testimony tending to show turbulance and civil commotion in the State, and disaffection of some of the collectors to the existing State governments in the months of May and

June, 1874, should have been excluded. Such a state of affairs, if it existed, would not vary the duties of the Treasurer, nor enlarge his discretion.

It was error to exclude from the jury the copy of the certified balance as taken from the Treasurer's books. No reason has been assigned in support of this ruling, and we imagine no plausible reason can be suggested. The balance seems to have been properly certified.

Sections 2451, 2452, Gantt's Digest, expressly make such a transcript competent and legal evidence. And it was pertinent to the issues. A copy of the accounts rendered by the Treasurer, being statements made by him to the State in the performance of his official duties, is evidence not only against him, but his sureties. They are entries made against the interest of the parties making them, and the surety is bound by the acts and declarations of his principal, being within the scope of the business as part of the *res gestae*. See *United States* v. *Gaussen*, 19 Wallace, 198.

The court should have told the jury not to go into the accounts, but to take the balance certified by the Auditor, unless the accuracy of the items was impeached; and that it was no error to charge Newton with the amount of his receipts to Page and the collectors. The circumstance under which the receipts were executed being undisputed, the propriety of charging Newton with their aggregate amount was a question of law.

The judgment of the Pulaski Circuit Court is reversed and this case remanded, with directions to give the plaintiff a new trial and to proceed in conformity to this opinion.

18

### SEPARATE OPINION.

EAKIN, J.:

Whilst I concur in remanding this cause to the Circuit Court for a new trial, I am unable to assent, in all respects, to the reasons given by the majority.

The record presents but one valid issue. Did Newton, as Treasurer, receive the funds charged to have come to his hands? Upon this issue the jury found for the defendants. The errors complained of in the motion for a new trial may be classed:

*First*—In permitting parol proof to go to the jury, to contradict the balance as shown against Newton on the Auditor's and Treasurer's books, and to show that he never had the funds in hands as Treasurer, and also parol proof to show the turbulent condition of the country at the time of the transactions.

*Second*—In refusing to admit, as evidence, the certificate of the succeeding Treasurer, as to the balance due from Newton, on the Treasurer's books.

*Third*—In giving and refusing instructions.

*Fourth*—That the verdict was contrary to instructions, and

*Fifth*—That it was contrary to evidence.

These points, presented by the record, are to be considered with reference to the sole issue, that is, the receipt of the funds by the Treasurer.

The evidence tended to show that Newton entrusted the whole management of the office to his deputy, Martin, and knew nothing, personally, of the business; that Martin, as such deputy, when he went into office took from Page, the former Treasurer, checks of Stoddard's bank upon itself for a balance of $18,000, then said to be on deposit there; that he receipted to Page for the funds represented by said checks, with the understanding that if the funds were not paid, the

receipt should not stand good ; that about $7000 was paid by the bank and about $11,000 lost. That Martin had meantime, in pursuance of the course of business used by the former Treasurer, settled with divers county collectors, by taking from them checks of the same nature upon the same bank, for the sums which appeared from their settlements with the Auditor to be due the Treasury, and giving them receipts, and charging the Treasurer with them on the Treasurer's books. It is not shown what use was made of these receipts either by Page or the collectors. The receipts themselves are not given in evidence, but proved orally. Stoddard testifies that this course was pursued for convenience and dispatch of business. That he was in the habit of taking up these checks from the treasury from time to time, in large quantities, and that they were given in the hurry of business. There is no positive proof that it was done to defraud the State, nor that Martin ever derived any pecuniary benefit therefrom. Every cent which actually came into the treasury was accounted for. The bank failed before all the checks had been taken up, leaving the deficit for which Newton is sued. During the transactions the bank was solvent.

Evidence of the disturbed condition of the country, and the contest then going on between two State governments in Arkansas, was admitted against the plaintiff's objections. This evidence had no bearing upon the Treasurer's duties, although it may have had some upon the question whether, or not, he acted in good faith in continuing this mode of receiving through Stoddard's Bank, in contravention of the law. This element of intention often enters into the consideration of an equitable estoppel. But, upon the whole, it is not apparent that this evidence had any influence upon the verdict, under the instructions. If an error at all to admit it, it was not such an error as to require reversal.

I think it was error to refuse to admit, on the part of the plaintiff, a certificate of the Treasurer, showing from his books a statement of the balance due the State from Newton. It seems admissible under sec. 2452 of Gantt's Digest. But the same state of account was shown by the certificate of the Auditor, and by the original books of the Treasurer, and the present Treasurer's evidence taken in court. The State does not seem to have been prejudiced by the refusal. There is no controversy about any fact which the certificate would have proved, if admitted.

The main, and indeed only important question arising on the record is : Was Newton positively estopped from denying, or explaining, the receipts so proved to have been issued, in order to rebut the *prima facie* case they made of money received. This leads us to discuss the nature of equitable estoppel, as applied to receipts.

Certainly, to take these checks for money was a plain violation of the statute, and a breach of the bond. This much goes of course, but that is not the issue—which is, did Newton receive the funds into his hands as Treasurer? It is rather in the nature of a misfeasance than a non-feasance. There is no proof that Martin declined to receive any money or effects tendered by Page or the Collectors, nor does it appear, except from inference, that when they sent the checks to the Treasury by Stoddard, or carried them there, they had moneys in hand which they would have paid over if the checks had not been taken. The Treasurer took the checks in the confident expectation that the bank would send and take them up—as it did a large amount of them. They may have regarded them as mere memoranda. In any case, he had no authority to take them, and it was, in effect, as if the Treasurer had received nothing. Unless his receipts estop him from this defense, neither he nor his sureties could be held responsible in this action.

Receipts are acts, not contracts. They are memorials of facts : and, as a general rule susceptible of oral explanation or contradiction. The exceptions to this rule are of two classes :.

*First*—and by far the most numerous, are receipts which embody a contract, such as to repay, or account, or redeliver, or do some other thing. The exclusion of evidence to vary or contradict these, stands on the same grounds with contracts. It is a question of law for the court.

*Second*—Those which are designedly and intelligently, or even carelessly, given under circumstances calculated to mislead third persons as to their rights ; and where, if repudiated or varied, the rights of others would be prejudiced, from having relied upon the receipts as true. As against those so liable to be prejudiced, the maker is estopped from denying them. Whether in any given case such an equitable estoppel arises, must always be a mixed question of law and fact, and should be left to a jury, with instructions as to the application of the law, if the fact be found. Whether the circumstances, surroundings, and conduct of the maker exist as facts which create the estoppel, is for the jury. Whether, if found to exist, they are to be taken as effective to make an estoppel, seems more properly a question of law for the court.

In this regard, the instructions actually given, refused, or modified by the court below, taken as a whole, are unsatisfactory, and may have misled the jury to suppose that, in any case, without regard to the circumstances under which the receipts were given, or to the action of other State officers with regard to these receipts, they might be explained to show that the money and effects were not actually received, and that because in a literal sense they had never gone into the Treasury, the Treasurer could not be held accountable for them as effects received.

The instructions are defective and misleading, rather in what they fail to express, than in actual language. The whole case

should have been given to the jury, with instructions to the effect that if they should find the receipts had been given by Martin without mistake or fraud inducing him thereto, with the intention to mislead, or put off their due guard those officers of the State whose duty it was to have prosecuted the claims against the former Treasurer and the Collectors : or given with such careless and culpable negligence, as to amount to constructive fraud, and that other officers relied upon those receipts, and were diverted from their duty to the detriment of the State, then they should hold the defendants to the *prima facie* case made by the receipts, and consider the effects as having been actually received into the Treasury.    But if otherwise, to find according to the facts.

I perceive no other material error in the record, and on these grounds alone concur in the order to reverse, and remand for a new trial.

Hon. Elbert H. English, Chief Justice, did not sit in this case.