# CASES DETERMINED

IN THE

# SUPREME COURT OF ARKANSAS

St. Louis, Iron Mountain & Southern Railway Company *v*.

State.

Opinion delivered April 10, 1911.

1. Constitutional law—construction of state constitution.—The State Constitution is not a grant of enumerated powers, and the Legislature may rightfully exercise its powers subject to the limitations and restrictions fixed by the Constitution of the United States and by the State Constitution. (Page 14.)

2. Same—presumption in favor of statute.—A statute is presumed to be constitutional, and will not be declared unconstitutional unless it is forbidden by the State or Federal Constitution in express terms or by necessary implication. (Page 14.)

3. Railroads—requirement as to spur tracks.—The Legislature may require railroad companies to build necessary spur tracks, or it may delegate to the Railroad Commission the power to require them to be built. (Page 15.)

4. Same—railroad commission—spur track.—An order of the Railroad Commission requiring a railway company to build a spur track at a certain place is presumed to be reasonable and just, but may be reviewed by the courts upon proof that it is so arbitrary and unreasonable as to be void for want of power. (Page 15.)

5. Same—order of railroad commission establishing spur track.—The question whether an order of the Railroad Commission requiring the construction of a siding at a certain locality was unreasonable and arbitrary was one of law for the court, and not of fact for the jury. (Page 16.)

6. Same—how reasonableness of such order determined.—In determining the reasonableness of an order of the Railroad Commission requiring the establishment of a spur track, the chief question is whether such improvement is necessary to meet the needs and promote the convenience of the public, though the fact that the cost of its establishment and maintenance might greatly exceed the revenues that would probably be derived from the business done at such place should be considered. (Page 16.)

7. SAME—SUCH ORDER NOT REGULATION OF INTERSTATE COMMERCE.—An order of the Railroad Commission requiring the establishment of a spur track at a place within the State is not a regulation of or interference with interstate commerce. (Page 18.)

8. SAME—DUE PROCESS.—Where a railway company was notified of a hearing before the Railroad Commission with reference to the establishment of a spur track at a certain place, and appeared and contested the proceeding before such Railroad Commission, it can not complain that the order of the commission deprived it of property without due process of law. (Page 18.)

9. CRIMINAL LAW—IMPEACHMENT OF INDICTMENT.—Where an indictment was properly returned into court, it will be presumed that it was duly found with the concurrence of the requisite number of the grand jury, and it was not error to refuse to allow a grand juror to testify as to the manner of its finding or as to a statement of fact upon which the indictment was based. (Page 19.)

10. RAILROADS—DISOBEDIENCE OF COMMISSION'S ORDER—LIABILITY.—Acts 1907, c. 338, making it a misdemeanor for a railroad company to fail or refuse to comply "with the findings, decrees and mandates" of the Railroad Commission, is not invalid because it makes each day of such failure or refusal a separate offense. (Page 20.)

Appeal from Marion Circuit Court; *Brice B. Hudgins,* Judge; affirmed.

### STATEMENT BY THE COURT.

August 12, 1909, the grand jury of Marion County returned into court the following indictment against the appellant, towit, (omitting caption):

"The grand jury of Marion County, in the name and by the authority of the State of Arkansas, accuse the St. Louis, Iron Mountain & Southern Railway Company of the crime of failing, refusing and neglecting to comply with a certain finding, decree and mandate of the Railroad Commission of Arkansas, requiring it to construct and connect with its main line of railway a spur track on its right-of-way at a point opposite the main crane erected at Comal, Arkansas, committed as follows, towit:

"The said St. Louis, Iron Mountain & Southern Railway Company, in the county of Marion and State of Arkansas, on the 2d day of September, 1908, unlawfully did fail, refuse and neglect to comply with a certain finding, decree and mandate of the Railroad Commission of Arkansas requiring it to construct and connect with its main line of railway a spur track on its

right of way at a point immediately opposite the mail crane erected at Comal postoffice, in the said county and State, of sufficient length to accommodate at least two cars, after the said Railroad Commission of Arkansas had, by its order No. 366 A, when said matter was properly and legally before said railroad Commission of Arkansas, on the 6th day of May, 1908, ordered that said St. Louis, Iron Mountain & Southern Railway Company on or before the 1st day of July, 1908, should construct and connect with its main line of railway a spur track on its right-of-way at a point immediately opposite the mail crane erected at Comal postoffice, Marion County, Arkansas, of sufficient length to accommodate at least two cars; contrary to the statute in such case made and provided and against the peace and dignity of the State of Arkansas.

[Signed]   "W. F. Reeves,
"Prosecuting Attorney 14th Judicial Circuit, Ark."

The grand jury of Marion County filed 166 other indictments against the appellant, charging a violation of said order of the Railroad Commission identical with the one above set out, except that a different date is alleged in each as the date upon which the offense was committed.   A motion was made to quash the indictment because it was not found and presented as required by law, and because there were pending against the defendant other subsequent indictments for the same alleged offense, etc. Testimony was introduced, and the court overruled the motion to quash.   Appellant then filed a demurrer to the indictment, which was by the court overruled.   Thereupon it filed its plea of not guilty and special pleas.   These pleas set up (1) not guilty; (2) it denied that the Railroad Commission made the order referred to in the indictment; (3) denied the authority of the Railroad Commission to make such order; (4) denied that it was the duty of defendant to establish and maintain a spur at Comal postoffice at the time the order was made, and that the same was necessary to the best interests of the public; (5) it alleged that the order of the Railroad Commission was invalid as violating the Interstate Commerce clause of the Constitution; and (6) that said order was invalid because repugnant to section 1, fourteenth amendment to the Constitution of the United States; (7) that same was in violation of the laws of the United States regulating

the carrying of mails under sec. 10, art. 1, of the Constitution; (9) that the enforcement of said order would deprive the appellant of its property without just compensation and without due process of law.

It alleged further "that at the place mentioned in said indictment no railroad crosses the defendant's track, and no public road of any kind crosses the defendant's road at any place." There is no town, and the only improvements at said place consist of a mail crane erected by defendant for the accommodation of the postoffice of Comal, which is located nearby. That there is no town at the postoffice, the only improvements consisting of a small box house, used as a general store and dwelling house and postoffice. The surrounding country is sparsely settled, largely wild and uncultivated and rough, a timber country producing not more than one carload of cotton annually, which is hauled to the neighboring town of Yellville, where the producers are accustomed to purchasing their supplies. That at Comal station, about 2,000 feet north of said postoffice and mail crane, there is a station where passengers and freight are received and discharged, and about five miles south of said postoffice and mail crane, on the line of the railroad, is the station Yellville, where there is a depot building and side tracks, depot tracks, stock pen, cotton platform and timber yards, and where a telegraph operator and passenger and freight agents are employed and stationed; and that said stations, Comal and Yellville, furnished to the inhabitants at and near Comal postoffice ample transportation facilities, and that to require the erection and maintenance of a siding or spur track, where the defendant would be required to receive and deliver freight and issue bills of lading at Comal postoffice, would force said defendant to maintain three stations in a sparsely settled country, within a distance of about six miles; that to erect a spur track as prescribed and comply with the order would cost in the neighborhood of $10,000, owing to the peculiar physical conditions and situation of the ground at that place. That, because of the topography of the country, it is impractical to provide said spur track, etc., except at a very great expense; that it would cost to maintain the same and carry out said pretended order $100 per month, and that the receipts from freights at the place would not pay more than a very small proportion of such

sum and expense attendant upon the maintaining of same as pre-
scribed in the order, and that such spur track and facilities would
have to be operated at a large monthly loss.   That said postoffice
is located at the foot of a heavy grade on defendant's line of rail-
way, with a rise of one foot to 100 feet.   There is a rising grade
to the south for a long distance, more than 25,000 feet, all of
which is a one per cent. grade, and that said postoffice is located
4,000 feet south of another abrupt grade similar to that toward
the south, and continuing at said grade for a distance of 15 miles
to the northward," etc.

The appellant requested a jury to try both the general plea
of not guilty and its special plea at the same time, but the court
overruled the request, and held that the special pleas should be
tried first, and not by a jury, to which ruling exceptions were
saved.   Appellant in its answer admitted that it had not built
the spur in controversy, and waived a jury to try its plea of not
guilty, and agreed that its plea of not guilty should be tried by
the court as a jury at the same time and upon the same evidence
and admissions introduced in the special plea.

The testimony tended to show that when this White River
branch of the railroad company was extended from Newport to
Joplin, Mo., there was built about five and one-half miles north-
west of Yellville station a water tank and side track or spur,
about 3,000 feet long, called Comal station, which was used as a
flag station and for taking water and for passing trains, loading
and unloading freight, etc.   Afterwards a postoffice was estab-
lished about 2,500 feet southeast therefrom on its line and named
Comal P. O., and mail crane erected near the track.   Between
Comal siding and Comal P. O. a creek runs, crossed by a trestle,
and between this creek and the postoffice there is a wide dry
creek or ravine which crosses under the railway track through
a large stone culvert, a few yards west of the mail crane.   This
culvert is 18 feet high, and west of it and the mail crane is a long,
deep, narrow cut.   East of the stone culvert and mail crane,
toward Yellville, is a deep cut, and a reverse or double curve,
and about 1 per cent. up grade eastward toward Yellville.   The
Comal postoffice is a short distance from the mail crane north of
the track.   After it was established, the people residing in the
vicinity, more than 15, petitioned the Railroad Commission to

require the railroad company to establish and maintain a depot with suitable sidings at or near the postoffice of Comal, and after giving notice of a hearing before it at which the company appeared, and holding a meeting upon the ground at Comal, where the company was represented by its superintendent, on May 6 the commission entered the following order, requiring the construction of a spur track:

"Office of Railroad Commission of Arkansas.

"Order No. 355 A, 2089.    Petition for depot and side track facilities at Comal postoffice, Marion County, Arkansas.

"Due and legal notice having been given, this matter coming on for hearing on this the 6th day of May, 1908, the same having been continued from a meeting held by the Commission, the entire Commission being present at Comal postoffice, Marion County, Arkansas, on the 14th day of April, 1908, at which meeting the petitioners were present and represented by Hon. J. W. Black, and the railroad company by its superintendent, John Daniels, and the matter coming on this day for decision of the Commission, after giving due consideration to the statements and arguments of all parties and being well and sufficiently advised in the premises, we find that there is a public necessity for a side track or spur at a point immediately opposite the mail crane erected at Comal postoffice, Marion County, Arkansas.

"It is further ordered by the Commission that the St. Louis, Iron Mountain & Southern Railway Company be, and the same is hereby, required to, on or before the 1st day of July, 1908, construct and connect with its main line of railway a spur track on its right-of-way at said point of sufficient length to accommodate at least two cars, thus affording shipping facilities at said point.    It is further ordered that the said railway company, upon the completion of said spur track, is to arrange to receive carload freight and issue bills of lading for the same, and to discharge less than carload shipments at said point.    It is further ordered that the prayer of the petitioners for a depot building at said point be and the same is hereby denied.    By order of the Commission.

"W. E. Floyd, Secretary.

"Little Rock, Ark., May 6, 1908."

On the part of appellant, the testimony tended to show that to comply with the order it would be necessary to extend the

stone culvert already mentioned 30 feet southward, and this, whether the spur should be built from the mail crane westward or northward toward Pyatt, Mo., or whether it should be built eastward or southward toward Yellville. That the cost of the extension of the culvert alone would be $2,500 to $2,800. In either direction the spur might be built, it would cost $5,000 or $6,000. That, to comply with the Commission's order further, it would be necessary to keep an agent there to issue bills of lading and receipt for freight deposited, which would cost about $75 per month. That the freight and passenger traffic combined would not produce a revenue of more than $50 per month. That the stopping of trains at the place would cause an additional expense and loss of time and a spur track made would make the operation of their trains dangerous to both train crews and passengers. That the community is sparsely settled, there being less than 200 families in two and one-half miles radius of the mail crane, which takes in Comal station and would extend within two and one-half miles of Yellville. It was also shown that, at the time of the investigation by the Commission and the time of the making of the order by them, the point on the railroad designated Comal station had a passing track of 3,000 feet in length, put in for the accommodation of passing trains; that there were no buildings of any kind at the point, and no shelter for passengers nor receptacle for freight; that there were cedar posts piled there for shipment, and that cars were furnished there on the passing track for that purpose, but there was no public road leading thereto, and to reach this siding required the crossing of private lands; that it is located in the Cotton farm. The principal product delivered for shipment there was cedar posts, a large portion of which were hauled from the vicinity of the mail crane. There were no facilities afforded for loading this cedar at this point, nor sufficient room on the company's premises for storing it. Shippers were required to use private lands for such purposes, and, after it was piled there, to carry it on their shoulders and put it in the car. One witness, describing it, said: "At the switch at Comal there is not much room outside of right-of-way lines to pile timber for shipment. It is crammed up and a bad place to put timber. Besides, on the north side of creek

(mail crane side) they have no road leading out from Comal spur."

Treating the railroad running through the points designated as the mail crane and Comal siding, as running north and south and also east and west, north and west towards Pyatt and east and south towards Yellville, the passing track at Comal siding was on the east side of the main line, and to reach this said track from the west side would necessitate the crossing of the main line and at this point of crossing the track curved in each direction around a bluff or bank, which obstructs the view of approaching trains. It could not be reached for loading and receiving freight without passing on private lands. To the left of said siding towards Pyatt is a hillside, and to the right is low bottom, which in time of high water overflows, leaving a deposit of quicksand and gravel. On this low bottom, shippers are required, on account of lack of room and no other facilities being provided, to stack their cedar posts for shipment, and there was no agent or other person kept there for receiving or delivering freight, and no one to whom application for cars could be made. The trains did not stop unless flagged. The practice or custom on this line of railroad is to construct a spur for receiving and discharging freight about every five miles, and from Yellville to the east or south to Pyatt to the west and north is a distance of 10 miles, without any spur for receiving or discharging freight, except this passing track at Comal siding. The distance by the railroad track from the east or south of the passing track to the mail crane is from 2,000 feet to three-fourths of a mile. Between the two points flows Crooked Creek, on the mail crane side of which is a high, steep bluff, ranging from 40 feet to 100 feet high, and extending over a distance of from one to one and one-half miles, both to the north and south of the mail crane. In point of accessibility in hauling freight to and from the station by the particular routes that existed at the time this order was made, Comal station was from one to two miles from the mail crane. There were two neighborhood roads leading thereto, which came together at a point about 150 yards from the mail crane. The road leading down the creek and across the defendant's railway just north and west of the mail crane had existed for many years, and had been continuously used by the public as

a road; but that portion extending to Comal siding was not put there until after the railroad was built. Both of these roads cross the Crooked Creek, which at certain seasons of the year overflows and renders them impassable. Each of these roads requires that those who haul over them pull steep hills and descend steep grades, and pass over the private lands of other parties. At and around the mail crane and postoffice is a settlement, a church, a store building, a voting precinct and schoolhouse. It is thickly settled, and within a radius of two and one-half miles is a vast supply of cedar timber suitable for commercial purposes, of the same character as was at that time and has been since shipped from Comal siding. There was also a vast supply of other timber, some of which was being shipped out for fire wood. In close proximity to this point is the best farming portion of that country, and on these farms cotton is grown, some of which is hauled to the Halliday gin in that neighborhood, which is nearer the mail crane than Comal siding; and there were no facilities for storing cotton for shipment at said siding. Some of those living in the neighborhood of the mail crane were engaged in buying, raising and shipping stock at the time, but no cattle pens or other facilities were provided for receiving such shipments.

All the evidence tends to show that by far the larger part of the freight tendered for shipment at the time this order was made by the Commission came from the Comal mail crane side of the creek and settlement. The evidence was practically undisputed that the spur track at the mail crane would be much more convenient and accessible for all persons residing on that side of the creek, and no single shipment was shown by any one residing on the Comal siding side of the creek. Up to that time suitable facilities for shipping the products from in and around the place had not been provided at any point nearer than Yellville, about five miles away.

As to the cost of construction, W. H. Elliott, witness for the State, a civil engineer, stated that Comal mail crane is located between two cuts, and a portion of the roadbed there consists of a stone culvert over dry creek and dump made from stone and debris taken from these cuts. The distance from the mail crane and bluff or cut towards Comal siding is between 350 and 400 feet. The distance of the crane at this particular point, from

the left rail of the track to the stone cap on the outside of the culvert, is 11 feet, and beyond the dump extends from the left rail to the left to a distance and width from 26 to 41½ feet. Starting the spur with a connection opposite the mail crane and running it towards Pyatt, no extension of the culvert would be necessary, and after the track was laid on the standard of defendant there would still remain between the left switch rail and the stone cap a space of about six feet, that would allow for the passage of the train crew while switching. This proposed construction, and the space left after same is made, was demonstrated by an exhibit, evidence which was not contradicted by the defendant, and testimony was from actual measurements taken. This dump is about two feet lower than the ballast or roadbed upon which rests the main line, and upon the switch there would have to be laid a roadbed on which to lay the switch track. To put in the switch after the grading was done would cost $400, according to the estimate of Mr. Hanna, a division engineer for the road and a witness for the defendant. Elliott testified that the entire cost of construction of a switch at this point and providing a driveway for wagons and teams for loading and unloading would cost not to exceed $710. By this method of construction, there would be no necessity for widening the cuts or extending the culverts, and estimate was based on actual measurements taken upon the ground.

All the testimony of the defendant or appellant was predicated upon the theory that the culvert must be extended 30 feet and excavations made in the bluff or cuts, but none of their experts contradicted or denied the practicability of building the spur or the cost thereof as shown on the plat made by Mr. Elliott, which provides a passway for wagons down the side of the dump and under the culvert. The evidence of appellant provides for the road over the culvert, and its experts admitted there was room at present between the main line and the culvert to lay a spur track without an extension of the culvert, but claimed room would have to be afforded for the passage of teams, wagons and train crew, and fixing the distance between the left rail and left stone cap of the culvert, at 67 feet, and width of dump rail to the edge thereof, from 15 to 21 feet. Each way actual measurement was shown to be from 21 to 21½ feet.

As to construction of switch towards Yellville in south and east direction, Mr. Elliott, the only witness who made actual measurements, testified that it would cost $1,100 to construct a spur track of the required size. Appellant's witnesses fixed the cost of the extension of 30 feet culvert at from $2,500 to $2,800, and the total cost of spur and extension from $5,000 to $6,000. On the profile map introduced, a line representing the grade of the road shows from the point designated as Comal station that the track is practically level to a point 39 feet beyond the mail crane; or, to be accurate, the grade begins, according to the map, at a point just 750 feet west or north of the west or north end of the trestle known as the George Creek trestle. The blue print shows the north or west end of this trestle to be about 4,450 feet from the mail crane. It further shows that it is down grade from the mail crane to where the heavy grade begins. The alignment of the track was shown to be perfectly straight for a distance of something like 1,500 feet from the mail crane east and south towards Yellville and about 2,800 feet towards Comal siding. The mail crane is about six feet from the side track, and is in plain view from Crooked Creek bridge, 900 feet away. The photograph views of the situation indicate that trainmen would have an unobstructed view of the roadbed for a sufficient distance on each side to observe a switch stand.

*W. E. Hemingway, E. B. Kinsworthy, James H. Stevenson, Horton & South,* and *S. D. Campbell,* for appellant.

1. The demurrer should have been sustained. The indictment is bad for uncertainty, indefiniteness and lack of material allegations. 30 Ark. 496; 43 *Id.* 93; 47 *Id.* 488; 47 *Id.* 572; 67 *Id.* 308; 66 *Id.* 251; 71 *Id.* 474; 80 *Id.* 310; 83 *Id.* 249; 93 *Id.* 84; Const. Ark. art. 2, § 10.

The act is void for indefiniteness and uncertainty. Act No. 338, approved May 17, 1904, amendatory of No. 149, approved April 5, 1907; 45 Ark. 164, citing Mans. Dig. § 1961. Also because it is unconstitutional. Const. Ark. art. 4, 5, 6 and 7; Const. U. S.; amend. No. 4, Const. 1874, Ark. The Legislature cannot go beyond the powers granted by the Constitution, as the provisions are a *limitation.* It is also void because the appellant's road is an *interstate* road (111 S. W. Rep. 500), and no notice of

trial is provided except *after* the order is made. Kirby's Dig.
§ 4424.

There was no public *necessity* for the spur, and its erection and maintenance would cause the company great expense without any corresponding benefit to the company or the public. 85 Ark. 12; 91 *Id.* 358.

2. The motion to quash should have been sustained, and there was error in excluding testimony thereon offered. Kirby's Dig. § § 2279, 2207-8-9; 73 Ark. 405. Subsequent indictments tor the same offense and matter were returned. Kirby's Dig. § 2252; 32 Ark. 236; 43 *Id.* 68; 50 *Id.* 534; 50 *Id.* 531; 8 Oh. Ct. 604; 81 Tenn. (13 Lea), 49 Am. Rep. 655; 63 Mo. 364; 2 Ind. (2 Cart.), 227; 4 Best & Smith, 775; 45 N. Y. 446; Kirby's Dig. § § 2425 to 2428.

3. The act of 1907 and the order are void because they deny the equal protection of the laws, no opportunity being given to test the validity of the order without incurring burdensome and *excessive* penalties. Const. U. S. 14 Amend.; 44 Am. Law Rev. 813, 815; 183 U. S. 79, 99; 209 *Id.* 128; *Ib.* 144-8; 212 *Id.* 19, 54.

4. It was error to deny a jury trial. Const. art. 2, § 10; 22 Ark. 214; 56 *Id.* 391; 75 *Id.* 435; 81 *Id.* 117; 20 *Id.* 463-493; 85 *Id.* 12.

5. There was error in the court's rulings as to the admission and exclusion of testimony. 69 Ark. 150.

6. Under the ruling in 91 Ark. 38 there is a total lack of evidence to support the reasonableness of the statute, but ample to show that the order is unreasonable, arbitrary and confiscatory.

*Hal L. Norwood,* Attorney General; *Wm. H. Rector,* assistant, for appellee.

1. The indictment was found and presented as required by law. Kirby's Dig. § § 2207-8-9; 73 Ark. 405; 50 *Id.* 28; 66 *Id.* 510; 1 Bish. Cr. Law, § 1051; Joyce on Ind. § 123; Kirby's Dig. § 2226; 34 Kans. 256. The finding of subsequent indictments does not suspend the indictment, the offenses being charged on different days. Kirby's Dig. § 2252. *Una et cadem res acta.* 12 Mo. 293; Joyce on Ind. § 112; 72 Ark. 419; 65 *Id.* 38; 34 *Id.* 48; 131 S. W. 688.

2. The indictment is not bad for uncertainty, indefiniteness or lack of material allegations. Kirby's Dig. § 2228-9; also 2241-2-3, *Id.;* 90 Ark. 343; 93 *Id.* 406; 92 *Id.* 413; 93 *Id.* 275; 22 *Id.* 81. Nor is the act void for uncertainty. 45 Ark. 164. Nor is it invalid as being contrary to our Constitution or that of the United States. 120 S. W. 1028; 92 Pac. 606; 124 U. S. 465; 102 *Id.* 691; 128 *Id.* 96. There is no regulation of interstate commerce involved. Legislation affecting interstate commerce is not inhibited when it is merely an aid to commerce. 102 U. S. 691; 128 *Id.* 96; 93 *Id.* 99; 166 *Id.* 427; 133 *Id.* 286; 163 *Id.* 299; 187 U. S. 137; 169 *Id.* 613; 216 *Id.* 27; 207 *Id.* 328; 216 *Id.* 262. The act is within the police power of the State. 54 Ark. 104; 66 *Id.* 409; 58 *Id.* 407; 59 *Id.* 521. Nor does it violate the fourteenth amendment. A corporation is not a *citizen* within the meaning of the fourteenth amendment. 8 Wall. 168; 172 *Id.* 239; 177 *Id.* 561; 204 *Id.* 359; 136 *Id.* 114; 86 Ark. 412. Nor does the act deprive appellant of its property without "due process of law." 156 U. S. 150; 169 *Id.* 466. The company contested the order. 71 S. C. 130; 2 Elliott on Railroads, § 682 A. Notice is provided for. The penalties are not burdensome nor excessive. 183 U. S. 79; 202 *Id.* 128; 212 *Id.* 19.

3. The refusal of the court to submit the issues raised by the special pleas to a jury was not error. The right to trial by jury only applies to common-law actions. 95 U. S. 294; 29 *Id.* 90; 21 Wall. 532; 40 Ark. 296-7; 85 *Id.* 24; 83 *Id.* 448; 86 *Id.* 69; 24 Cyc. 102, note 80.

4. The act does not deprive appellant of its property without due process of law, nor without compensation, and is not violative of the fourteenth amendment, but, on the contrary, is a just and reasonable exercise of legislative authority. 85 Ark. 12; 91 *Id.* 358; 85 *Id.* 181; 54 *Id.* 112; 156 U. S. 649; 142 *Id.* 449; 109 La. An. 263; 13 Cyc. 140-144, 145; 3 Wood on Railroads, § 287 d, 495; 179 U. S. 428; 206 *Id.* 1; 22 Wall. 136; 176 Ill. 512; 48 So. 236; 85 Ark. 23; 207 U. S. 88; 32 L. R. A. 857; 52 N. E. 292; 103 Mass. 254; 115 N. W. 757; 85 Ark. 288; 173 U. S. 285. Having agreed to put in the spur, the company is estopped. 70 Ark. 467; 109 U. S. 65. Where there is any reasonable doubt as to the constitutionality of an act, it is upheld, 33 Ark. 17; 1 Ark. 513.

*W. E. Hemingway,* in reply.

1. The order raises no presumption as to reasonableness, public necessity, etc., and there is no estoppel. 169 U. S. 466; 173 *Id.* 685; 21 So. 15; 26 L. R. A. 224; 120 S. W. 1028; 22 Am. St. 556; 154 U. S. 362; 58 Am. R. 484; 79 N. W. 510; 40 So. 263; 107 S. W. 525; 85 Ark. 12; 91 *Id.* 358.

2. There is no presumption of reasonableness, etc., because the commission exceeded its authority. 64 Atl. 233; 78 N. E. 358; 94 N. W. 406; 49 So. 118; 111 Pac. 396.

Kirby, J., (after stating the facts). The power of the Railroad Commission to make the order violated, and for a violation of which appellant was indicted, is challenged because the Legislature could not rightfully authorize the Commission to make it, and because the making of such order was an unreasonable and arbitrary exercise of it, if it had such power.

Amendment No. 4 to the Constitution authorizes the creation of the Railroad Commission, and is not a limitation of the authority that may be vested in it for effecting all the purposes for which it was designed and established; and if it could be regarded otherwise, the whole unrestricted power of the people necessary to the proper regulation of railroads may well be exercised by it under laws to correct abuses and prevent unjust discriminations and excessive charges by railroads, as authorized thereunder.

A State's Constitution is not an enabling act nor a grant of enumerated powers, and the Legislature may rightfully exercise the power of the people subject to the limitations and restrictions fixed by the Constitution of the United States and the State. *Straub* v. *Gordon,* 27 Ark. 629; *Vance* v. *Austell,* 45 Ark. 400; *Carson* v. *St. Francis Levee District,* 59 Ark. 513; *State* v. *Martin,* 60 Ark. 343; *Cox* v. *State,* 72 Ark. 97.

A statute is presumed to be constitutional, and all doubts must be resolved in favor of its constitutionality; and in determining whether it is constitutional the court should look to see, not whether power has been expressly given to make it, but only to ascertain whether in express terms or by necessary implication it is forbidden. *Patterson* v. *Temple,* 27 Ark. 202; *Duke* v. *State,* 56 Ark. 485; *Leep* v. *Railway Co.,* 58 Ark. 407; *State* v. *Martin,* 60 Ark. 343. It is no longer questioned that a State Legislature

may by statute require railroads to perform certain duties to the public and furnish proper and adequate facilities for the transportation of freight and passengers intrastate, and that it may clothe commission's and administrative bodies with such power.

In *Missouri Pac. Ry. Co.* v. *Kansas,* 216 U. S. 275, the court said: "The court in *Atlantic Coast Line Co.* v. *N. Car. Corporation Commission,* 206 U. S. 7, reiterating the doctrine propounded in preceding cases, said (p. 19): 'The elementary proposition that railroads, from the public nature of the business by them carried on and the interest which the public have in their operation, are subject, as to their State business, to State regulation which may be necessary, either directly by legislative authority, or by administrative bodies endowed with power to that end, is not and could not be successfully questioned, in view of the long line of authorities sustaining that doctrine.'

"Also in the same case, restating a principle previously often announced, it was held (p. 20) 'that railway property was susceptible of private ownership, and that rights in and to such property rested in constitutional guaranties by which all private property was protected. Pointing out that there was no incompatibility between the two, the truism was reannounced that the right of private ownership was not abridged by subjecting the enjoyment of that right to the power of reasonable regulations, and that such governmental power could not in truth be said to be curtailed because it could not be exerted arbitrarily and unreasonably without impinging on the enduring guaranties by which the Constitution protected property rights.' "

The Legislature had the right to require the construction of this spur track, and, having it, could delegate the power to the Railroad Commission, as it has done by said act of 1907. See Acts 1907, c. 338. If it had made the requirement directly by statute, instead of conferring the power upon the Railroad Commission to make it, its action would have been subject to judicial review only as being so arbitrary and unreasonable as to cause it to be void for want of power, as this court held in *Louisiana & Ark. Railway Co.* v. *State,* 85 Ark. 12, and *St. Louis S. W. Ry. Co.* v. *State,* 97 Ark. 473.

The order of the Railroad Commission made under the authority delegated to it is subject to like review for the same

cause, and, being the tribunal provided by law for passing upon the question under the prescribed procedure as to the petition, notice, hearing, inspection of the locality affected, and granting of the relief prayed for, by requiring the construction of the spur track in question, its order, duly made, is presumed to be reasonable and just and a proper exercise of the power granted to it, unless and until the contrary is made to appear to the satisfaction of the court upon its subjection to such judicial review.

Appellant contends that it was deprived of a constitutional right by the court refusing to submit the matter to trial by jury upon its demand. No provision is made in the laws creating the Railroad Commission and prescribing its powers and duties nor in the act of 1907 under which the order for the violation of which appellant was indicted was made by it, expressly or by implication, for the trial or review of its acts and orders by a jury as questions of fact.

In *Kirkland v. State*, 72 Ark. 177, the court said: "It is true that the Constitution provides that "the right of trial by jury shall remain inviolate" (art. 2, § 7); and that no person shall "be deprived of life, liberty or property without due process of law" (art. 2, § 8). But it is well settled that it is only to cases at common law in which the issues of fact were triable by jury, and perhaps such as are of similar analogous nature, that the guaranty relied upon by the appellant extends. A jury trial is not necessary to constitute due process of law in every case. *Govan* v. *Jackson*, 32 Ark. 553; *Williams* v. *Citizens*, 40 Ark. 290." The question as to whether or not said order was unreasonable and arbitrary was one of law for the court, it never having been intended that a jury should pass upon as a question of fact whether the exercise of power by the Legislature or by the Railroad Commission under legislative enactment was unreasonable and arbitrary. *Louisiana & A. Ry. Co.* v. *State*, 85 Ark. 12; *St. Louis S. W. Ry. Co.* v. *State, supra*.

The court committed no error in refusing its demand for a jury to try the question under its said plea, and it waived its right to a jury and consented to a trial by the court upon the question of its violation of the order made by the Railroad Commission.

The Railroad Commission, in the proper exercise of the pow-

ers conferred upon it by the act of 1907, had primarily the right to determine whether the public necessity and convenience required the establishment of the spur track for the loading and unloading of freight at Comal postoffice, and, having determined by an order duly made in accordance with said act, its determination will not be disturbed unless it is clearly shown that such requirement is unreasonable and arbitrary. In the determination of the reasonableness of the requirement the chief question to be considered is, whether such improvement as directed to be made is necessary to meet the needs and promote the convenience of the public. The fact that its establishment and maintenance might greatly exceed the revenues that would probably be derived from the business done at such place because of the improvement is a matter to be considered also, but does not necessarily control. The testimony shows that at and around the place where this spur track was ordered constructed is a settlement, a church, a store, postoffice building, a voting precinct, school house; that it is thickly settled, and within a radius of two and a half miles is a vast supply of cedar timber suitable for commercial purposes, and other timber which was being shipped out for fire wood. In close proximity to this point is some of the best farming lands of that county, and cotton is grown upon the farms, some of which is hauled to the gin in that neighborhood, which is nearer the mail crane than the Comal siding beyond the creek, where there were no facilities for storing cotton for shipment. That people in the neighborhood were engaged in buying and raising and shipping stock at the time the improvement was ordered, and that no stock pens or other facilities were provided at the Comal station for receiving shipments of that kind—virtually that there were no adequate shipping facilities provided nearer than Yellville, five miles away. The evidence tended to show that it was practicable to construct the spur track as directed towards the north for $710, and towards the south for $1,100, and that the probable revenue that would be derived would amount to $50 per month.

The evidence adduced by the Railroad Company tended to show that it would require a much greater amount to construct the spur, whether it was extended to the north or to the south, and that it would probably cost $75 a month to comply with the

order in preparing to receive freight for shipment at the spur and issue bills of lading. But the order itself does not require that an agent shall be maintained at the spur where no depot nor station house existed, and where none was expected to be constructed, but only seems to indicate that the same practice as to receiving shipments of freight and issuing bills of lading should obtain there as at other spurs where no agent was maintained, and that it would be put to no additional expense, of course, on that account.

Under this proof we are not able to say that the Railroad Commission in making said order acted without reason and arbitrarily in determining that there was a public necessity for the establishment and maintenance of this spur track as directed by it. Neither do we think that such order and requirement is subject to the objection that it was in effect a regulation of or interference with interstate commerce, and on that account void. Such order requiring the construction of said spur at Comal postoffice where the public necessity warranted its being made was but the proper exercise of the police power of the State by the Commission to whom the authority was delegated, and was not an attempt to regulate, lay burdens upon or interfere with interstate commerce, which it could only affect incidentally, if at all. *St. Louis S. W. Ry. Co.* v. *State,* 97 Ark. 473; *Sherlock* v. *Alling,* 93 U. S. 99; *Mobile County* v. *Kimball,* 102 U. S. 691; *Smith* v. *Alabama,* 124 U. S. 465; *Gladson* v. *Minnesota,* 166 U. S. 427; *Missouri, K. & T. Railway Co.* v. *Haber,* 169 U. S. 613; *Missouri Pac. Ry. Co.* v. *Kansas,* 216 U. S. 262.

It is contended that said act and order of the Commission thereunder deprived appellant of its property without due process of law. This objection is not tenable, however, for the act provides that "no order shall be made until all parties concerned shall receive ten days' notice of the proposed action by the Railroad Commission." In this case the notice was shown to have been given, the Railroad Company appeared before the Commission in opposition to the petition for the spur track, and made no complaint because of a lack or insufficiency of notice. Its superintendent was also present upon the ground at the site where the proposed improvement was to be made, and at both places had the right to, and did, urge all facts and objections that would tend to

show the cost and difficulty of the construction of the improve-
ment asked for and the want of any public necessity therefor.
After the hearing and decision it was properly notified of such
order by a copy served in accordance with the provisions of the
act, and advised that it would comply with same, and requested
and was granted time in which to do so. A legislative determi-
nation of this question would not be open to the objection that it
was a deprivation of property without due process of law, and
how much less reason is there for urging such objection to the
action of the Railroad Commission, the tribunal provided by law
for the ascertainment of the necessity for such improvement after
an investigation is made of which it had notice, and in which it
appeared and took part. Having appeared in such tribunal and
contested the matter throughout, it has no right to complain that
the order of the commission deprives it of property without due
process of law.

In *Louisville & N. W. Ry. Co.* v. *Schmidt*, 177 U. S. 230,
236, the court said: "It is no longer open to contention that
the due process clause of the Fourteenth Amendment to the Con-
stitution of the United States does not control mere forms of pro-
cedure in State courts or regulate the practice therein. All of
its requirements are complied with, provided in the proceedings
which are claimed not to have been due process of law the person
condemned has had sufficient notice and adequate opportunity
has been afforded him to defend."

The indictment was sufficiently specific, and, having been
properly returned into court by the grand jury and showing upon
its face, and by such return and filing and docketing in court in
their presence and without objection by any of them, to be in all
respects regular and in accordance with law, it will be presumed
that it was duly found with the concurrence of the requisite num-
ber of the grand jury, and the court committed no error in refus-
ing to allow a member of the grand jury to testify as to the man-
ner of finding or statement of fact upon which the indictment
was based and by the grand jury ordered to be drafted. *Nash* v.
*State*, 73 Ark. 399; sections 2207-8-9-2224, 2226, Kirby's Digest;
*State* v. *Skinner*, 34 Kan. 256.

Neither was error committed in overruling the motion to
quash the indictment, because there were 166 other indictments

pending against appellant because of the same failure and refusal to construct the spur in accordance with the direction and requirement of said order of the Railroad Commission. The statute expressly makes each day's violation of such order by the Railroad Company, failing and refusing to comply with it, a separate offense and punishable as such, and these indictments, although they were each in fact a charge of an offense for a like violation of the same order, each was for a different day, and was for a separate offense under said statute.

The penalties provided by this statute were intended to compel a compliance with, and obedience to, the reasonable orders, regulations, decrees and mandates of the Railroad Commission duly made after notice and a hearing, and they are not burdensome and excessive nor greater in any way than reasonably necessary to effect such purpose; and the enforcement of the act does not deny appellant the equal protection of the law or violate its rights guaranteed by the Fourteenth Amendment to the Constitution of the United States.

Finding no error in the judgment, it is affirmed.