MARTIN BORCHERT *v.* BOB K. SCOTT ET AL

AND VIRGIL T. FLETCHER

5-5293                                    460 S. W. 2d 28

Opinion delivered June 15, 1970

[Supplemental opinion on rehearing delivered October 19, 1970.]

[Rehearing denied November 23, 1970.]

*Talbot Field, Jr.* and *Sam Robinson,* for appellant.

*Joe Purcell,* Attorney General; and *Lyle Williams,* for appellees.

CONLEY BYRD, Justice. This appeal by Martin Borchert and Virgil T. Fletcher questions the constitutional validity of the documentary tax stamp act, being Act 239 of 1969, under amendment 20 to the Constitution of Arkansas. The matter was instituted by Borchert as a property owner and taxpayer against appellees Bob K. Scott, individually and as Commissioner of Revenues for Arkansas; James C. Morris, J. A. West, L. C. Dial, J. R. McKinley, Orville I. Richolson, Ovid Switzer, arid C. E. Tudor, individually and as members of the State Parks, Recreation and Travel Commission of the State: Keith Tudor, J. W. McCracken, Dr. Joseph L. Rosenzweig, Mrs. Fred MacDonald, Harold F. Ohlen-·dorf, Gordon Gurley and James Cuthbertson, individually and as members of the Arkansas Board of Mental Retardation. Virgil Fletcher intervened. After a stipulation of the facts and issues and that all moneys received by the commissioner of revenues were to be received as paid under protest, the trial court dismissed the complaint and intervention. For reversal appellants rely upon a number of Constitutional provisions including Amendment 20, which provides that, ". . .THE STATE OF ARKANSAS SHALL ISSUE NO BONDS OR OTHER EVIDENCE OF INDEBTEDNESS PLEDGING the faith and credit of the State or ANY OF ITS REVENUES FOR ANY PURPOSE WHATSOEVER, except by and with the consent of the majority of the qualified electors."

The appellees contend that Amendment 20 applies only to general obligations of the State of Arkansas and that so long as the bonds authorized by the legislature are secured by revenues to be derived from a special and defined source, such as the revenues produced by Act 239, Amendment 20 is not involved. In this connection they contend that there is no constitutional restriction on the power of the legislature to

allocate revenues collected from a single source between "treasury funds" and "cash funds".

Insofar as here pertinent Act 239 provides:

"AN ACT to Impose a Tax on the Transfer of Real Property; to Provide for Penalties for Failure to Comply With This Act; and for Other Purposes."

*Be It Enacted by the General Assembly of the State of Arkansas:*

SECTION 1. There is hereby levied on each deed, . . . when the consideration for the interest or property conveyed exceeds One Hundred ($100.00) Dollars a tax at the rate of One Dollar and Fifty Cents ($1.50) for each Five Hundred ($500.00) Dollars, or fractional part thereof.

SECTION 2. The tax imposed by this Act shall not apply to transfers of the following: . . .

SECTION 3. The tax levied by this Act applies at the time of transfer and shall be computed on the basis of the consideration for the real estate transferred.

SECTION 4. The County Recorder of Deeds shall not record any instrument evidencing a transfer subject to this Act unless the instrument shall have affixed thereto a documentary stamp or stamps evidencing the full payment of such tax. . . .

SECTION 5. The Commissioner of Revenues shall design such documentary stamps. . .

SECTION 6. All revenues derived from the tax levied by this Act shall be paid over to the Commissioner of Revenues and shall be deposited in one or more banks selected by him and from time to time withdrawn from such banks in the pro-

portions indicated for use for the following purposes:

(a) An amount not exceeding three percent (3%) of such deposits for payment of the expenses of the Commissioner of Revenues in administering the provisions of this Act, including the costs of designing and printing the documentary stamps, the preparation and printing of information material and of any regulations which he may promulgate with respect to the use of such stamps and their safe-keeping, and for reimbursing the State Treasury for any such expenses of administration hereunder which were paid by the use of State-appropriated funds.

(b) The remainder thereof, but not less than ninety-seven per cent (97%) shall be deposited by the Commissioner of Revenues as follows:

(1) Twenty per cent (20%) shall be deposited by the Commissioner of Revenues in the State Treasury and credited to the County Aid Fund and distributed at the end of each month to the respective counties from which the revenues originated.

(2) Forty per cent (40%) thereof to the Arkansas Children's Colony Board (the 'Colony Board'). Funds so remitted to the Colony Board are hereby specifically declared to be cash funds and shall not be deposited in the State Treasury but shall be deposited in trust in a bank or banks in this State, as the Colony Board may from time to time select and used by the Colony Board, as it shall determine, to operate, maintain, develop and improve institutional and community facilities and services for the mentally retarded, and all or any part may be pledged to and used for the payment of revenue bonds issued by the Colony Board pursuant to Act 186 of 1963, as and to the same extent as the charges referred in Section 7 of Act 186 of 1963. So long as any revenue bonds are outstanding, to the

payment of which revenues derived from the tax levied by this Act are pledged, the tax levied by this Act shall continue to be collected and the revenues derived therefrom shall continue to be deposited as provided in this Act and to be pledged to and used for the payment of the outstanding bonds, principal and interest, until the outstanding bonds are fully paid or adequate provision made therefor; and

(3) Forty per cent (40%) thereof to the State Parks, Recreation and Travel Commission of the State of Arkansas (the 'Commission'). Funds so remitted to the Commission are hereby specifically declared to be cash funds and shall not be deposited in the State Treasury but shall be deposited in trust in a bank or banks in this State as the Commission may select, and used by the Commission as it shall determine, to operate, maintain, develop and improve the Public Parks system of the State, and all or any part may be pledged and used for the payment of revenue bonds, issued by the Commission pursuant to Act No. 539 of 1953, as amended, as and to the same extent as revenues derived from the properties and equipment of the State Parks System. So long as any revenue bonds are outstanding, to the payment of which revenues derived from the tax levied by this Act are pledged, the tax levied by this Act shall continue to be collected and the revenues derived therefrom shall continue to be deposited as provided in this Act and to be pledged to and used for the payment of the outstanding bonds, principal and interest, until the outstanding bonds are fully paid or adequate provision made therefor.

Act 186 of 1963 referred to in Section 6(b) (2) provides that, "bonds issued under the provisions of this act shall be general obligations only of the Board, and in no event shall they constitute an indebtedness for which the faith and credit of the State of Arkansas or any of its revenues are pledged. . . ." Act 399 of 1953

referred to in Section 6(b) (3) contains a similar provision.

Amendment No. 20 has been before this Court in a number of cases. See *Miles* v. *Gordon*, 234 Ark. 525, 353 S. W. 2d 157 (1962); *Holmes* v. *Cheney*, 234 Ark. 503, 352 S. W. 2d 943 (1962) and *McArthur* v. *Smallwood*, 225 Ark. 328, 281 S. W. 2d 428 (1955). Commencing with *Davis* v. *Phipps*, 191 Ark. 298, 85 S. W. 2d 1020 (1935), we have consistently held that revenue bonds based upon revenues of an agency in the nature of "cash funds" could be pledged for the payment of bonds issued by a state agency *without violating* Amendment No. 20, so long as the faith and credit of the State of Arkansas was not pledged. However in each case thus far decided, when discussing the sources of the pledged revenue, we have been careful to point out that the revenue source involved was not taxes. In the *McArthur* case, *supra*, we pointed out that the funds there involved were special funds not otherwise available for the general purposes of the state.

The distinction between "cash funds" and "taxes" as public revenues was made in *Gipson* v. *Ingram*, 215 Ark. 812, 223 S. W. 2d 595 (1949). There the sole issue was whether a legislative appropriation, pursuant to Article V, § 29, was a prerequisite to payment by an agency from an accumulated cash fund, derived from various sources such as student fees, dormitory charges, etc. We held that no appropriation was necessary, after determining that no part of the funds were derived from taxes.

In *Moore* v. *Alexander*, 85 Ark. 171, 107 S. W. 395 (1908), we had before us "An Act to Provide for the Completion of the State Capitol Building" which levied a tax of one-half mill on each dollar of taxable property to be "continued to be levied and collected and appropriated. . . until said Capitol is fully completed." We there held a continuing appropriation to be violative of Article V, § 29, which provides that

". . . no appropriation shall be for a longer period than two years." This court in *Dickinson, State Auditor* v. *Edmondson,* 120 Ark. 80, 178 S. W. 930 (1915), commented upon *Moore* v. *Alexander,* above, as follows:

> ". . . We are unwilling to recede from the position taken in that case, for it is plain that the framers of the Constitution intended to place an unmistakable limitation upon the authority of public officials in paying out public funds, and to declare that all the State funds which are within the purview of that provision must be held in the treasury, until a specific appropriation thereof has been made by the Legislature. The power of the General Assembly with respect to the public funds raised by general taxation, is supreme, and no State official, from the highest to the lowest, has any power to create an obligation of the State, either legal or moral, unless there has first been a specific appropriation of funds to meet the obligation. The Constitution provides, too, that no appropriation shall be for a longer period than two years, and thus a period is fixed over which the lawmakers hold complete control over the purse-strings of the State."

When we remember that the U. S. Constitution, Art. 1, § 10, provides that, "No state shall. . . pass any. . . law impairing the obligation of contracts. . ." and that the law existing at the time of the issuance of bonds by a state agency becomes a part of the contract within the meaning of the contract clause of the U. S. Constitution, the reason for the distinction between revenues of an agency or "cash funds" and taxes becomes obvious. If the 1969 General Assembly can delegate to a state agency the authority to make the documentary stamp tax irrevocable for a number of years through the issuance of bonds, then no reason appears why the 1971 legislature cannot do the same thing with the income tax or the gross receipts tax. After a few such instances, the people of this State would be powerless

to obtain any relief from any tax levied irrespective of the prevailing economic conditions. It was a sad economic condition that caused the enactment of Amendment 20. See *Davis v. Phipps,* 191 Ark. 298, 85 S. W. 2d 1020 (1935), where we said:

> . . . "Citizens of the State who have been interested in its welfare and who have attempted to keep themselves reasonably well-informed know what the evils were for which Amendment No. 20 was framed to cure. It must be a fact well recognized in State history that, at the time Amendment No. 20 was being considered l v the electors of the State, the financial affairs of our Commonwealth had been well-nigh wrecked by issuance of bonds far in excess of the amount justified by the liquid resources of the State. High taxes had been imposed to raise revenues to meet these enormous obligations. It was well understood then, as it is now, that a continuation of these practices that had grown up were pyramiding debts and tapping every source of revenue for payment thereof and could not continue without practical bankruptcy."

It is suggested that the act here involved does not levy a tax, even though the act consistently refers to the stamps as a tax and notwithstanding that it in effect constitutes a three percent excise upon the sale price of all real estate. Furthermore, the stipulation shows that one single real estate transaction produced approximately $350,000 in revenues. We find no merit in, the suggestion. Neither do we accept the appellees' assertion that the legislature's classification of the revenues as "cash funds" is conclusive under the authority of *McArthur v. Smallwood, supra.* That same decision makes plain that a determination of whether an act violates Amendment 20 by pledging the faith and credit of the State is one of substance for the court even though the act contains an express provision to the contrary.

Thus as we analyze Act 239 it levies a tax, by-

passes the State Treasury, and delegates to a created agency, under the federal contract clause, the authority to issue evidence of indebtedness and to irrevocably pledge, for a number of years in the future, the right of the people of this State to use or to repeal that part of the State's taxing power involved. It must be remembered that Amendment 20 applies not only to evidence of indebtedness for which the State's faith and credit is pledged, but also to evidence of indebtedness for which any of its revenue is pledged. To hold that the bonds here authorized are not in violation of Amendment 20, because of the creation of the agency and the bypassing of the State Treasury with the tax, would be to put form above substance. This we refuse to do because a tax is clearly a revenue of the State of Arkansas as distinguished from a revenue of a State agency.

Having determined that Sections 6(b) (2) and 6(b) (3) are violative of Amendment No. 20, the issue then arises whether the whole act must fall or only the invalid portion. The rule is stated in *Cotham* v. *Coffman,* 111 Ark. 108, 163 S. W. 1183 (1914), quoting from Cooley's Constitutional Limitations (6 ed.), in this language:

"* * * Where, therefore, a part of a statute is unconstitutional, that fact does not authorize the courts to declare the remainder void also, unless all the provisions are connected in the subject-matter, depending on each other, operating together for the same purpose, or otherwise so connected together in meaning that it can not be presumed the Legislature would have passed the one without the other. The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand, though the last fall. The point is not whether they are contained in the same section; for the distribution into sections is purely artificial; but whether they are essentially and inseparably connected in substance. If,

when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with apparent legislative intent, wholly independent of that which was rejected, it must be sustained. The difficulty is in determining whether the good and bad parts of the statute are capable of being separated, within the meaning of this rule. If a statute attempts to accomplish two or more objects, and is void as to one, it may still be in every respect complete and valid as to the other. But if its purpose is to accomplish a single object only, and some of its provisions are void, the whole must fail, unless sufficient remains to effect the object without the aid of the invalid portion. And if they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant the belief that the Legislature would not pass the residue independently, then if some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected must fall with them.''

For the reasons stated in *Cotham* v. *Coffman, supra,* and *Conway County Bridge Dist.* v. *Fullerton,* 196 Ark. 413, 117 S. W. 2d 1065 (1938), we do not believe that the Legislature would have passed Act 239 without Section 6 or even without subsections b(2) and b(3). Thus the further issue arises whether the invalid portions of subsections 6(b) (2) and 6(b) (3) can be severed from the valid portions. We reach the conclusion that the invalid portions cannot be separated. It appears to us that the provisions declaring the tax to be cash funds and directing that the funds not be paid into the State Treasury but deposited in trust in such banks as the Board or Commission shall designate are so mutally connected with and dependent upon the provision authorizing issuance of bonds as to warrant the belief that the legislature would not have passed the residue independently.

JOHN A. FOGLEMAN, Justice, concurring in part; dissenting in part. I concur fully with the majority in the conclusion that those provisions of Act 239 of 1969, which authorize the pledge of the revenues provided for by that act, are in conflict with Amendment 20 to the Constitution of 1874 and invalid. The act imposes a tax which is without question a revenue of the state.

I disagree, however, in the holding that the whole act may be held void, nor do I agree that all of Section 6(b)(2) or all of Section 6(b)(3) is violative of Amendment 20. Only those portions relating to the pledging of these revenues run afoul of the constitutional inhibition. Since 6(b)(2) and 6(b)(3) are identical in form except for the agency involved, I will set out only 6(b)(2), without the unconstitutional provisions, to illustrate that there remains a complete, independent, separable, constitutional, workable portion, consonant with the legislative intention to accomplish one of this section's two objects, i. e., to levy a tax, of which 40 per cent would be dedicated to the improvement of our institutions for the mentally retarded,[1] to wit:

> Forty per cent (40%) thereof to the Arkansas Children's Colony Board (the "Colony Board"). Funds so remitted to the Colony Board * * * shall not be deposited in the State Treasury but shall be deposited in trust in a bank or banks in this State, as the Colony Board may from time to time select and used by the Colony Board, as it shall determine, to operate, maintain, develop and improve institu-

---

[1]The same may be said with reference to the intention to improve our state parks.

tional and *community* facilities and services for the mentally retarded, * * *

We are not authorized to declare an entire act, or even an entire section thereof, invalid because a part of the act or section is unconstitutional, unless all of the provisions of the act, or the section, are so dependent on each other that it *cannot* be presumed that the legislature would. have passed one without the other. If, when the unconstitutional portion is deleted, the remainder of the act or section is complete in itself and capable of being executed according to the legislative intent, wholly independent of the part rejected, we *must* sustain it. *Ex parte Levy,* 204 Ark. 657, 163 S. W. 2d 529; *Cotham* v. *Coffman,* 111 Ark. 108, 163 S. W. 1183. In *Brooks* v. *Wilson,* 165 Ark. 477, 265 S. W. 53, for example, we held that, even if the provisions of an act relative to disposition of funds realized from the sale of state school lands were unconstitutional, the remaining provisions of the act regulating the manner of sale of the lands would not be affected. We reiterated the oft-stated rule that, if any special provision of an act be unconstitutional and *can* be stricken without affecting the validity of the residue of the act, it *will* be done, and the remainder of the act allowed to stand. In my opinion no better example calling for the application of the above principles could ever be found than that now before us.

It is clear that the legislative objects of Act 239 were:

(1) to levy a .tax upon real estate transfers;

(2) to increase state aid to our financially disadvantaged counties;

(3) to improve the care and education of mentally retarded persons;

(4) to develop our state parks;

(5) to permit the pledge of these tax revenues to the retirement of bonds issued by the agencies designated to administer the programs relating to the mentally retarded and the state parks under authority given by other statutes.

It is only the last of these purposes that does not meet constitutional requirements. It seems clear to me that this last objective was secondary, perhaps even an afterthought. At most it was permissive. Surely the General Assembly did not mean to hinge succor to these distressed agencies upon their ability to pledge tax revenues set aside for them. I do not see how a provision could possibly be less essential, or more incidental, to the primary legislative purpose than this appendage we find unconstitutional. Removing it from the body of the act is no more fatal than the usual removal of an appendix from a normal human body.

Although no question was raised in the points relied upon by appellant as to the validity of the provision for deposit of the revenues going to the Children's Colony Board and to the State Parks, Recreation and Travel Commission in banks rather than the state treasury, I anticipate that it may arise and consider it pertinent to consideration of the severability of the act.

There is absolutely no constitutional prohibition against such a provision and no requirement whatever that all revenues, or even all tax revenues, be deposited in the state treasury. A contention to the contrary was laid to rest completely in *Gipson* v. *Ingram*, 215 Ark. 812, 223 S. W. 2d 595. The language of Mr. Justice McFaddin speaking for a six-judge majority in that case is so explicit and so pertinent that I take the liberty of quoting from it at length:

* * * In determining the answer to the posed question, we emphasize that the Legislature, as the supreme lawmaking body, possesses all legislative

powers except those expressly or impliedly pro-
hibited by the Constitution. *State* v. *Ashley*, 1 Ark.
513; *Straub* v. *Gordon*, 27 Ark. 625; *Bush* v. *Mar-
tineau*, 174 Ark. 214, 295 S. W. 9, 10.[2] So we
examine the Constitution to see if the Legislature
is prohibited from allowing the state agencies
and institutions to have and disburse cash funds.

It will be observed that both in Art. V, sec. 29
and Art. XVI, Sec. 12, as previously copied, it is
required that no money shall be drawn from the
treasury until the same shall have been duly ap-
propriated. There is no language in our present
Constitution which requires that all of the public
money shall be paid into the state treasury. Such
a provision exists in the Constitutions of some
States, but not in our present Constitution. For

---

[2][Footnote 5 in quoted material.] This court used the following language
in this opinion, all of which is apropos to the case at bar: "Before proceed-
ing to a discussion of the issues raised by this appeal, we deem it proper to
premise our remarks by two fundamental rules of construction announced
and adhered to throughout the history of this court: First, that the Consti-
tution of this state is not a grant of enumerated powers to the Legislature,
not an enabling, but a restraining act (*Straub* v. *Gordon*, 27 Ark. [625], 629),
and that the Legislature may rightfully exercise its powers subject only to
the limitations and restrictions of the Constitution of the United States and
of the State of Arkansas. *St. Louis I. M. & S. Ry. Co.* v. *State*, 99 Ark. 1,
136 S. W. 938; *Vance* v. *Austell*, 45 Ark. 400; *Carson* v. *St. Francis Levee
Dist.*, 59 Ark. 513, 27 S. W. 590; *Butler* v. *Board* [*of Directors of Fourche
Drainage Dist.*] 99 Ark. 100, 137 S. W. 251. In other words, as was said in
*McClure* v. *Topf & Wright*, 112 Ark. 342, 166 S. W. 174: 'It is not to be
doubted that the Legislature has the power to make the written laws of
the State unless it is expressly, or by necessary implication, prohibited from
so doing by the Constitution, and the act assailed must be plainly at variance
with the Constitution before the court will so declare it.' Second, that an
act of the Legislature is presumed to be constitutional, and will not be
held by the courts to be unconstitutional, unless there is a clear incompatibili-
ty between the act and the Constitution, and, further, that all doubt on the
question must be resolved in favor of the act. *State* v. *Ashley*, 1 Ark. 513,
552; *Eason* v. *State*, 11 Ark. 481; *Dabbs* v. *State*, 39 Ark. 353, 43 Am. Rep.
275; *Sallee* v. *Dalton*, 138 Ark. 549, 213 S. W. 762; and in *Standard Oil Co.
of La.* v. *Brodie*, 153 Ark. 114, 239 S. W. 753, this court quoted the language
of the Supreme Court of the U. S. in *Hooper* v. *California*, 155 U. S.
[648], 657, 15 S. Ct. 207, 39 L. Ed. 297, that 'the elementary rule is that
every reasonable construction must be resorted to in order to save a statute
from unconstitutionality.' "

instance, in the Arkansas Constitution of 1868 there was a provision, Art. X, Sec. 17, which read:

"The general assembly shall tax all privileges, * * * and the amount thus raised shall be paid into the treasury." [3]

Likewise, the 1875 Constitution of Missouri provides in Art. IV, sec. 43: "All revenue collected and moneys received by the State from any source whatsoever, shall go into the treasury, * * *."

In the 1902 Constitution of Virginia, section 186, there is this language: "All taxes, licenses, and other revenue of the State, shall be collected by its proper officers and paid into the State treasury except in pursuance of appropriations made by law; * * *."

It will be observed that in the quoted provisions from these Constitutions there is the requirement of deposit into the treasury. But when these Constitutions are compared with the present Arkansas Constitution of 1874, it is clear that our present Constitution requires only that money in the treasury shall not be removed except by legislative appropriation. There is no requirement in the present Arkansas Constitution that all public money shall be paid into the state treasury. The absence of such a provision from our present Constitution appears to have been a studied and deliberate omission. Certainly, such omission leaves the Legislature of this State free to provide that public money derived as in this case may be deposited as cash funds, for use by the state agencies and institutions.

To buttress the conclusion reached, we point out

---

[3][Footnote 6 in quoted material.] This constitutional provision was involved in the case of *Straub* v. *Gordon*, 27 Ark. 625, decided in 1872.

provides that the State Treasurer: "* * * shall perform such duties as may be prescribed by law."

Thus the Constitution clearly empowers the Legislature to decide whether the State Treasurer shall be required to receive all state funds. This Art. VI, sec. 22 of our present Constitution was so worded in light of the fact then existing that the Revised Statutes of 1836, Chap. 18, sec. 22, prescribed the Treasurer's duties: "To receive and keep all the moneys of the State, not expressly required by law to be kept by some other person * * *." [4]

The conclusion is inescapable that the Constitution of 1874 empowered the Legislature to state what money should be paid into the state treasury.

It was conceded by appellees in the oral argument that all cash funds of the state agencies and institutions are public moneys. The Legislature could require that all these funds be paid into the state treasury, and the Legislature could require that none of these funds be expended without appropriation by the Legislature. But the question here is not what the Legislature might do with these funds. The question is whether the Constitution requires that all these moneys be paid into the state treasury. We find no such provision. To that extent the appellant is in error in this case.

In *McArthur* v. *Smallwood*, 225 Ark. 328, 281 S. W. 2d 428, the court, in treating the application of Art. 5, Sec. 29 and Art. 16, Sec. 12 to certain funds, clearly and unequivocally stated:

* * * and we find no express constitutional restriction upon the supreme power of the Legislature to deal with public revenues of any type prior

---

[4][Footnote 7 in quoted material.] Chap. 18, sec. 22, of the Revised Statutes of 1836 is now sec. 5526, Pope's Digest and Sec. 12-609, Ark. Stats. of 1947. See *State* v. *Newton*, 33 Ark. 276.

to the time such revenues are placed in the state treasury. Therefore, since the Constitution is a restriction upon the otherwise supreme power of the Legislature rather than a grant of power to the Legislature, there would appear to be no sound constitutional reason for nullifying the express legislative action in this particular.

While it is true that we also held that the funds there involved were "cash funds" or moneys received from sources other than taxes, the decision that the constitutional restrictions did not apply was also based upon the quoted language.

Of course, there is no question about the constitutional validity of a continuing levy of taxes. *Moore v. Alexander,* 85 Ark. 171, 107 S. W. 395; *McArthur v. Smallwood,* supra. Once levied, a tax continues until it expires by its own limitation, or is repealed by a subsequent Legislature. *Moore v. Alexander,* supra. The latter opinion also finds no prohibition against special levies.[5] Furthermore, the continuing appropriation was held invalid there solely because the funds were paid into the state treasury pursuant to the act by which they were levied. The concluding language in the opinion leaves no room for doubt on that score:

> * * * and, the Legislature not having acted since that time, it is the legislative determination that this fund be conserved in the treasury until another Legislature appropriates it for the purpose for which it was created.

I earnestly submit that this court should act with great restraint in striking down an entire legislative act simply because we feel one provision to be unconstitutional. Feeling that this case demands the exercise of this restraint, I respectfully dissent from that part

[5]An example of a special levy is found in Ark. Stat. Ann. § 18-1348 (Repl. 1960) for the Workman's Compensation Fund. It is paid into the state treasury pursuant to requirements of the statute itself, but the use of the fund is limited to the Workman's Compensation Commission.

of the majority opinion striking down any of the act except that relating to pledge of the revenues.

Brown, J., joins in this dissent.